Leonard N. BEBCHICK et al., Appellants,

v.

PUBLIC UTILITIES COMMISSION et al., Appellees.

No. 16454.

United States Court of Appeals District of Columbia Circuit.

Re-argued Nov. 14, 1962.

Decided Jan. 31, 1963.

Supplemental Opinion Feb. 21, 1963.

Certiorari Denied May 13, 1963.

See 83 S.Ct. 1304.

Mr. Harold Leventhal, Washington, D. C., with whom Messrs. Leonard N. Bebchick and Leonard S. Goodman, Washington, D. C., were on the brief, for appellants.

Mr. George F. Donnella, Counsel, Public Utilities Commission of the District of Columbia, with whom Messrs. Chester H. Gray, General Counsel, and Andrew G. Conlyn, Counsel, Public Utilities Commission of the District of Columbia, were on the brief, for appellee Public Utilities Commission of the District of Columbia.

Mr. Harvey M. Spear, Washington, D. C., with whom Mr. Owen J. Malone, Washington, D. C., was on the brief, for appellee, D. C. Transit System, Inc.

Mr. Harold Smith, Washington, D. C., also entered an appearance for appellee, D. C. Transit System, Inc.

Before BAZELON, Chief Judge, and EDGERTON, WILBUR K. MILLER, FAHY, WASHINGTON, DANAHER, BASTIAN, BURGER and WRIGHT, Circuit Judges, sitting en banc.

FAHY, Circuit Judge, with whom BAZELON, Chief Judge, and EDGERTON, WASHINGTON and WRIGHT, Circuit Judges, join.

On March 2, 1960, the Public Utilities Commission of the District of Columbia, after a hearing which is not challenged procedurally, by order No. 4631 authorized an increase in the cash fare of Transit users from 20 cents to 25 cents, effective March 6, 1960. The Commission denied Transit's petition for a greater increase, thus continuing the token rate of five tokens for a dollar, the 10 cent school fare and other transportation charges not relevant to a discussion or decision of this case. On March 31, 1960, the Commission issued its opinion, setting forth the reasons for its action. Transit in the meantime had placed in effect the increase in cash fare by a new tariff of March 6, 1960.

The Commission used the year ending September 30, 1959, as the period for determining Transit's past earnings, and the calendar year 1960 was selected as the test period for future earnings, account being taken of changes in the level of revenues and expenses. No question is made as to the appropriateness of the test periods.

Present appellants in this court, whose standing to challenge the order was upheld in Bebchick v. Public Utilities Commission, 109 U.S.App.D.C. 298, 287 F.2d 337 (1961), appealed to the District Court under § 43–705, D.C.Code.[1] The District Court dismissed the appeal and affirmed the order of the Commission. The case is before us on appeal from this action of the District Court. A division of our court, one judge dissenting, affirmed the order of the District Court, followed, however, by grant of appellants' petition for rehearing en banc. There ensued reargument and submission of the appeal to the full court, which brings us to the present posture of the case. A majority of the court now decide that the order of March 2, 1960, must be set aside insofar as it granted an increase in the cash fare to 25 cents.

We consider first Transit's suggestion that the case is moot due to supersession of the order of March 2, 1960, by the Commission's order No. 4735 of January 18, 1961. The latter order, however, continues in effect a cash fare of 25 cents. A rate order such

---

1. Transit's petition to the District Court for relief was later dismissed on stipulation.

as the one before us is not mooted by another which has the effect of keeping the controversy alive. Southern Pacific Terminal Co. v. Interstate Commerce Commission, 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310 (1911); Eastern Airlines, Inc. v. Civil Aeronautics Board, 87 U.S. App.D.C. 331, 185 F.2d 426 (1950). Moreover, the validity of the order of March 2, 1960, during the time it was in effect before it was superseded, remains in controversy; for the disposition of any excess funds which might have accumulated prior to January 18, 1961, by reason of the invalidity of the increase, remains for decision. So we hold that the case is not moot.

Our consideration of the merits must take account of two statutes. The first is § 43–706 of our Code, which provides:

"In the determination of any appeal from an order or decision of the Commission the review by the court shall be limited to questions of law, including constitutional questions; and the findings of fact by the Commission shall be conclusive unless it shall appear that such findings of the Commission are unreasonable, arbitrary, or capricious."

The other statute which is particularly important is the Act of July 24, 1956, 70 Stat. 598, known as the Franchise Act, § 4 of which reads as follows:

"It is hereby declared as a matter of legislative policy that in order to assure the Washington Metropolitan Area of an adequate transportation system operating as a private enterprise, the Corporation, in accordance with standards and rules prescribed by the Commission, should be afforded the opportunity of earning such return as to make the Corporation an attractive investment to private investors. As an incident thereto the Congress finds that the opportunity to earn a return of at least 6½ per centum net after all taxes properly chargeable to transportation operations, includ-

ing but not limited to income taxes, on either the system rate base or on gross operating revenues would not be unreasonable, and that the Commission should encourage and facilitate the shifting to such gross operating revenue base as promptly as possible and as conditions warrant; and if conditions warrant not later than August 15, 1958. * * * "

▮ In reference to this provision we note that the Commission, we think properly, did not consider a return of 6½ per centum net to be required, if less were reasonable and met the need to attract private investors. With the increase allowed in cash fare the Commission found that Transit would have a net operating income of $1,143,249, and gross operating revenues of $27,872,478. The system rate base was found to be $16,016,810. According to these calculations it was found that the fare increase would enable Transit to earn a return of 4.10% on gross operating revenues, or 7.14% on the system rate base. The Commission held that a rate which netted such earnings "falls within the range of what we consider to be a fair return."

Our difficulty with the foregoing is that because of errors in two respects to be discussed the net operating income is made by the Commission to appear less than the amount which was actually available therefor. A third defect in the decision might cause the inaccuracy to be still greater. Correction of the errors would show a substantially greater amount available as net operating income, with corresponding increase in the rates of return.

We interpolate here that we do not disagree with the use made of the gross operating revenue method, authorized by Congress in the terms set forth in Section 4 of the Franchise Act. The Commission's opinion adequately explains its use of this method, with, however, the system rate base method also being used to test the reasonableness of the rates. The Commission states:

"Although we have concluded that the gross operating revenue method should be utilized to fix rates in this proceeding, we do not agree with the contention that the gross operating revenue method should be the sole determinant of the reasonableness of rates. The gross operating revenue method and the 'rate base-rate of return' method are both valuable indices of the reasonableness of the earnings of a transit company. We have long recognized that the theory employed in determining the amount of revenue required by a transit company is immaterial so long as the end result—the amount allowed—is adequate to enable the company to meet its interest requirements, to pay reasonable dividends, to permit retention of a reasonable proportion of earnings in the business, to provide a margin for unforeseen contingencies, and to attract the necessary capital to meet its future capital requirements. In utilizing the gross operating revenue method we fully recognize the need for checking the reasonableness of the return earned under that method. * * * Where a rate base is available, as in the case here, such a check can be readily made, thereby furnishing an appropriate means of measuring the reasonableness of the rate of return computed under the gross operating revenue method. On the basis of the foregoing, the Commission finds that the 'rate base-rate of return' method for fixing rates affords a sound basis for testing the reasonableness of the rate of return computed under the gross operating revenue method of fixing rates, and concludes that the 'rate base-rate of return' method should be employed in this proceeding to test the reasonableness of the rate of return computed under the gross operating revenue method. Accordingly, we deem it necessary in this proceeding to make a rate base determination."

■ One further more or less preliminary matter should be mentioned. One of the principal items of operating expense allowed by the Commission in the process of arriving at net operating income is the expense of fulfilling Transit's obligation of track removal and repaving in converting its transportation system from a street car to a bus operation. The Commission found that this cost would be $10,441,958, and that allocations should be made therefor spread equally over a ten-year period from August 15, 1956, or $1,044,196 annually for ten years, the transition to be completed by August 15, 1966. Appellants contend that this item was erroneously treated by the Commission as an operating cost. They say that track removal and repaving is a burden which was assumed by the investors of Transit under section 7 of the Franchise Act. In appellants' language, "it is unreasonable and unlawful to require the farepayers to make contributions of capital to Transit by the device of an allowance for track removal and repaving." Appellants seek to support this position by pointing out that Transit purchased the properties for $10,000,000 less than their book value, and that this was due to Transit's assumption of the track removal and repaving obligation. Upon consideration again of this problem, now by the court en banc, we think the Commission has met in a reasonable manner the substance of appellants' contentions on this aspect of the case. The Commission used the $10,339,041 "acquisition adjustment"—the amount paid for the properties below their book value—as a basis for reducing depreciation. As the Commission states:

"Briefly, the credit for amortization of acquisition adjustment in the amount of $1,033,904 is the annual write-off of the total amount of $10,339,041, which is the excess of depreciated original cost of road and equipment acquired by D. C. Transit System, Inc. from Capital Transit Company over that portion of the purchase price assignable to road

and equipment. The record shows that the amortization of this excess over a ten-year period was adopted in lieu of distributing the purchase price of the property over all of the items of property acquired. That is to say, the property is recorded on the books of D. C. Transit System, Inc. at original cost to Capital Transit Company, in accordance with the provisions of the Uniform System of Accounts, and depreciation is accrued on the basis of original cost, with an off-setting credit for amortization of the acquisition adjustment to effectively reduce the provision for depreciation to the basis of depreciation of the purchase price of the property."

In this manner the Commission gave consideration to the reduced purchase price paid by Transit. The farepayers will receive benefit in the form of reduced depreciation in the total amount of $10,339,041, to be written off annually in the amount of $1,033,904.

This brings us to the three matters which lead us to conclude that the order of the Commission should be set aside.

1. *Accruals as operating expenses of the estimated cost of track removal and repaving.*

Section 7 of the Franchise Act places upon Transit the obligation to convert its street railway operations to bus operations within seven years from July 24, 1956, unless extended by the Commission. And see the District of Columbia Appropriation Act, 1942 (55 Stat. 499, 533). In connection with this transition the Commission states as follows:

"Provision for track removal and repaving in the amount of $1,044,196 represents the annual provision for the cost of track removal and repaving estimated at a total cost of $10,441,958, said total cost to be provided equally over a ten-year period from August 15, 1956. The estimated total cost of track removal and repaving is based on the average of a Company estimate of $11,-883,916 and an estimate by the staff of the Commission of $9,000,000, in both instances contemplating complete removal of the entire track structure.

\*    \*    \*    \*    \*    \*

"A question has also been raised with respect to the adequacy or inadequacy of the provision that is presently being made for track removal and repaving. Up to the present time, there has been only a limited amount of track removal and repaving work undertaken, so that sufficient data are not now available for testing the adequacy or inadequacy of the provision. The Commission recognizes that the provision now being made is based on engineering estimates which may prove to be either excessive or deficient by actual experience. We have indicated our intention of keeping this matter under study with a view to making such adjustments as might be found appropriate in the future. Pending further experience, we find for purposes of this proceeding that the annual provision of $1,044,196 for track removal and repaving is reasonable."

We accept the Commission's estimate that if Transit were to remove all tracks and do all the repaving consequent thereupon the total cost would be approximately $10,441,958. But if the conclusion of the Commission that Transit was actually to incur the total amount of this cost be considered a finding of fact we think that on the present record it is unwarranted and, therefore, unreasonable, and if it be considered a legal conclusion we think it is erroneous. Section 7 of the Franchise Act reads as follows:

"The Corporation shall be obligated to initiate and carry out a plan of gradual conversion of its street railway operations to bus operations within seven years from the date of the enactment of this Act upon terms and conditions prescribed by the Commission, with such regard as is reasonably possible when

appropriate to the highway development plans of the District of Columbia and the economies implicit in coordinating the Corporation's track removal program with such plans; except that upon good and sufficient cause shown the Commission may in its discretion extend beyond seven years, the period for carrying out such conversion. All of the provisions of the full paragraph of the District of Columbia Appropriation Act, 1942 (55 Stat. 499, 533), under the title 'Highway Fund, Gasoline Tax and Motor Vehicle Fees', subtitle 'Street Improvements', relating to the removal of abandoned tracks, regrading of track areas, and paving abandoned track areas, shall be applicable to the Corporation."

■ These provisions contemplate that Transit's program of track removal and repaving shall be coordinated with the highway development plans of the District of Columbia, resulting in economies implicit in such coordination. And the Appropriation Act of 1942 referred to in Section 7, while it obligates Transit to pay the entire cost of removing such tracks as are removed, and to repave the area when the street is not being paved, requires it to pay only one-half the cost of repaving the track areas when roadway repaving is there being carried out by the Highway Department pursuant to its road maintenance program. No allowance is made by the Commission for these important factors which would reduce the cost to Transit of track removal and repaving. In recognition that its estimates of the total cost might prove to be either excessive or deficient the Commission expressed its intention to keep the matter under study with a view to making such adjustments as might be found appropriate. This is not a sufficient justification for an in-

crease in the cash fare on March 6, 1960, on the assumption that the full estimated cost would be incurred or, if so, would fall entirely upon Transit. At the time of the order there had already accumulated more than $3,000,000 as a reserve for track removal and repaving. Only $61,-338 had been expended for that purpose in 1958 and 1959. A large part of the program could be borne by this reserve while the Commission gained greater experience in aid of making adjustments.[2] The existing reserve was available well into the future. While it was being utilized experience could be gained with respect to economies due to coordination of the program with the highway development plans of the District of Columbia, and with respect also to economies due to recapping tracks instead of removing them. We think in these circumstances it was unreasonable for the Commission in March, 1960, to authorize an increase in fare on the theory that all tracks would be removed and the area they had occupied repaved and, also, that Transit alone would be required to meet the full cost of such a program.

We are not advised by the record or in the Commission's decision of any thorough inquiry about the economies contemplated by the Franchise Act.[3] Such inquiry would have enabled the Commission to reach an informed judgment with regard to such economies, removing much of the speculation upon which the fare increase rests. In any event the Commission could have provided that the increase, insofar as it was based upon the cost of track removal and repaving, was conditioned upon the need therefor as this might appear upon review of the situation before the large reserve available in March, 1960, approached exhaustion. It simply cannot be said that the record then showed the need for an increase in fare to provide annually over

2. This would be true even if the larger estimate of the company, $11,883,916, should turn out to have been more accurate than the figure of $10,441,958 found by the Commission to be the cost of total removal and repaving if Transit paid the total.

3. The Commission in its brief states: "There is no definite schedule for track removal and repaving * * *."

a ten year period for more than a million dollars as an operating expense for this item of track removal and repaving. The order should have taken into account the probability that economies would make the actual cost much less; for it was clearly contemplated by the Franchise Act that all taxpayers, through plans shared by the District of Columbia, with perhaps Federal assistance, would assume some of the cost. Yet the present order proceeds on the theory that the entire cost would fall upon Transit. In some reasonable manner the situation we have outlined should have been reflected in the decision of the Commission. It is no answer to say that the company might at some unforeseeable future time be obliged to remove tracks which might currently be paved over. The increase is during a ten year period which is still current. While we recognize there were uncertainties in the situation, in our view it was not consistent with consumer interests to resolve so many of the doubts in favor of a fare increase not shown to have been necessary. Since something less than complete and total removal and repaving would be an operating expense of Transit the Commission could not reasonably act on the basis that Transit would be obliged to remove all tracks and also bear the cost of all repaving.

2. *The allowance of depreciation for buses.*

■ Depreciation for buses was allowed on the basis of a study made by the Commission in 1953. The company was allowed to accrue depreciation annually at seven per cent of the original cost of the buses to the first owner who put them into public service. This gave each bus a service life of fourteen years. The Commission used the "group method." This method rests on the theory that although some buses would be used and depreciated for more than fourteen

years, others for one reason or another would not last out fourteen years and thus the average life of the buses would approximate fourteen years. But depreciation on this theory cannot be squared with the facts of the present case. Depreciation continued to be allowed on so many buses beyond the theoretical service life of fourteen years as to distort this item of operating expense. By 1959 the reserve accumulated in this manner had resulted in an excess accrual of approximately $1,200,000 over and above the original cost of the buses. Accruals on the same basis were made also during the test period and charged against Transit's gross revenues as operating expense, thereby understating Transit's net income. The justification offered is that no change should be made from the group method until a complete study of the problem had been undertaken. Although no doubt such a study would be advisable this did not justify in March, 1960, the continuation of this deduction from gross revenues in arriving at the net operating income actually available.[4] The record fails by far to demonstrate that the average theory was working.

The Chief Accountant of the Commission, in answer to a question whether any properties are retired from the bus account under 14 years said: "They would be very minor. There are a few buses that were retired by reason of accidents in the past prior to 14 years, but I think generally in the last 10 years I don't recall of any appreciable number of buses retired prior to a 14 year life." Testimony of the Vice-President and Comptroller of Transit shows that of 50 buses retired in 1958 all but two were 17 years old or older. In 1959, of 43 retired or scheduled for retirement all were 17 years old or older. This same officer was asked, "Does the company plan to retire at any time in the future buses which are less than 14 years old?" He

4. In a subsequent rate proceeding the Commission has adopted the unit method of bus depreciation in lieu of the group method. The utilization of the unit method in the interest of preventing future excess depreciation accruals fortifies the view that the continued excess depreciation accruals permitted by the Commission in the proceeding under review was unsound.

replied, "Not so long as they are capable of being maintained in good, safe, operable condition, no."

We hold that the substantial inflation of operating costs due to excessive depreciation of buses is unlawful.

3. *Depreciation accruals on abandoned rail properties.*

The Commission's treatment of depreciation on abandoned rail properties is not supported by the record. The record discloses that the net undepreciated cost of Transit's rail facilities as of December 31, 1959, was $5,121,644, and further that Transit, by January 3, 1960, had abandoned 49.40 per cent of its rail facilities. These factual findings are accepted by us. Transit contended that it should be allowed to recover the entire cost during the remaining 43.5 months of the conversion period, that is, from January 1, 1960, through August 15, 1963. The staff agreed that Transit was entitled to recover this cost over some future period but thought that to increase the normal depreciation rates so that depreciation could be completed within the remaining conversion period would unduly burden Transit's customers. The staff recommended and the Commission approved an additional annual depreciation allowance of $295,500 based upon the track facilities actually abandoned by Transit on January 3, 1960. The undepreciated cost of these facilities would amount to $2,530,092. Pending further study the Commission declined to make any further provision for extraordinary retirement loss beyond this annual provision of $295,500.

■ The justification for a depreciation allowance on abandoned property depends upon whether Transit's investors have in the past been compensated for assuming the risk that the property would have to be abandoned before the investment in the property was entirely recovered. In Washington Gas Light Co. v. Baker, 88 U.S.App.D.C. 115, 123, 188 F.2d 11, 19 (1950), cert. denied, 340 U.S. 952, 71 S.Ct. 571, 95 L.Ed. 686 (1951), we said:

"It thus becomes relevant to determine whether or not investors have, during the useful life of this [abandoned] property, been compensated for assuming the risk that it would become inadequate or obsolete before the investment in it was entirely recovered.

\*   \*   \*   \*   \*   \*

"It is not for us to say \* \* \* whether or not the risk of obsolescence \* \* \* was borne by the investor in the past and whether he was compensated for it. That is an inquiry which must be made in the first instance by the Commission."

■ In this case the conversion from a street railway system to buses brings into play the same principle as though the matter were one of obsolescence. The present decision of the Commission does not meet the requirements of Baker. The allowance for depreciation of abandoned rail properties is not supported by a finding, in turn supported by evidence, that the "risk of obsolescence [abandonment] \* \* \* was borne by the investor in the past and [he was not] compensated for it." It is not merely a question of findings. It is, more importantly, a matter of substance. It is our view that the requirements of Baker must be met in any new order.

The Commission found that for the future test period the net operating income of $1,143,249 which would result from the authorized increase in fare would provide a fair rate of return as measured by the gross operating revenue method or by the rate base-rate method. As we have said, it found that a net operating income of $1,143,249 provided a rate of return of 4.10% on gross operating revenues or 7.14% on the rate base of $16,016,810, and that this rate of return fell within a range the Commission considered to be fair, enabling the Company "to meet its interest requirements, to pay reasonable dividends, to permit retention of a reasonable proportion of earnings in the business, to

provide a margin for unforeseen contingencies, and to attract the necessary capital to meet its future capital requirements." [5] In reaching these conclusions the Commission also found that without the increase in fare the net operating income would be only $660,146, insuring a rate of return of only 2.47% on gross operating revenues and of 4.12% on the rate base. For the reasons we have given in discussing the expense items for track removal and repaving and for bus depreciation, items deducted by the Commission in arriving at net operating revenues, the errors in these items are reflected in the findings of the Commission of net operating income of only $1,143,249 with the increase, and of only $660,146 absent the increase. Accordingly we cannot accept those findings of net operating income. The calculations of net operating income, and resulting rates of return, would be shown to be substantially larger but for the errors referred to. This is aside from the result which might follow reconsideration of the depreciation accruals on abandoned rail properties. The present record accordingly does not support the reasonableness of the end result reached by the Commission.

We come to our conclusion not without awareness that we are not the regulatory body having primary responsibility for utility rate regulation in this jurisdiction. Yet in the performance of our review responsibility we cannot on this record find adequate basis for an increase on March 6, 1960, of Transit's cash fare to 25 cents.

We do not enter our judgment simultaneously with the issuance of this opinion. The parties are requested within ten days to submit memoranda of their views as to the form of judgment appropriate to carry out this opinion.

BASTIAN, Circuit Judge (dissenting).

I dissent for the reasons stated in what was the majority opinion when filed July 12, 1962, but which has now been vacated pursuant to our en banc action. That original majority opinion, which had not been reported, is set forth below and represents the views of Judge MILLER, Judge DANAHER and myself.

*Majority Opinion Filed July 12, 1962*

"BASTIAN, Circuit Judge.

"This is an appeal from a judgment of the District Court, dismissing an appeal from an order of the Public Utilities Commission of the District of Columbia determining the rates to be charged in the District of Columbia by appellee D. C. Transit System, Inc.

"On November 6, 1959, Transit filed with the Commission a petition for change in its schedule of rates. At that time the rates, for other than school fares, were a cash fare of 20¢, or a token fare of 20¢ in units of $1.00. Transit asked for a cash fare of 25¢ during rush hours [1] and 20¢ for other times, these fares to be effective until November 1, 1960, after which the rate asked was 25¢ to apply at all times.

"After lengthy hearings, the Commission determined on March 2, 1960, that the twelve-month period ended September 30, 1959, was a proper period for determining Transit's actual level of earnings for a past test period, and that the twelve-month period ending December 31, 1960, was a proper period for measuring the company's estimated level of earnings for a future test period, after giving effect to appropriate adjustments for changes in the level of revenues and expenses.

"The Commission further found that the estimates of operating results for

5. The interest charges during 1960 approximated $317,000. If dividends were to be maintained at the current level it was estimated that $500,000 additional would be required.

"1. Rush hours were to be 6:00–9:30 A.M. and 3:30–7:00 P.M., Mondays through Fridays, except on legal holidays.

1961 and 1962 were not sufficiently reliable to serve as a basis for providing, at the time of its order, for an increase in rates to become effective on November 1, 1960, as Transit proposed. The Commission proceeded to find that the system operating revenues applicable to mass transportation operations for the future test period were estimated to be $26,708,655; that the system rate base applicable to mass transportation operations for the future test period, determined by giving equal weight to net original cost and to purchase price of the property, is $16,016,810; and that the net operating income from system-wide transportation operations for the future test period ending December 31, 1960, estimated to be $66,146, would provide Transit with a return of 2.47% on gross operating revenues of $26,708,655 and a return of 4.12% on the rate base of $16,016,810.

"The Commission further found that, under the fare structure proposed by its staff, a 25¢ cash fare, tokens at five for $1.00, and a 10¢ school fare, together with a comparable increase in fares from the company's other mass transportation operations, would produce net operating income of $1,143,249 for the future test period; and that this would result in a return of 4.10% on adjusted gross operating revenues of $27,872,478 under the fare structure proposed by the staff, and a return of 7.14% on the rate base of $16,016,810.

"Thereupon, the Commission issued Order No. 4631, dated March 2, 1960, fixing the cash fare at 25¢ and token fare at 20¢ in units of five for $1.00. Petitions for reconsideration were filed by certain civic organizations and a number of individual streetcar riders, including Bebchick and Goodman, and, as well, by Transit. These petitions for reconsideration were overruled by the Commission. Thereupon, appeals to the District Court were filed by appellants [2] and by Transit.[3]

"The District Court dismissed appellants' original complaint on the ground that they were without standing to bring the appeal. We reversed. Bebchick v. Public Utilities Commission, 109 U.S. App.D.C. 298, 287 F.2d 337 (1961). On remand, and after certain preliminary proceedings, the District Court, with the administrative record before it, denied appellants' motion for summary judgment, granted the Commission's motion to dismiss, and on June 5, 1961, affirmed the order complained of.

"In its order dismissing the complaint, the District Court correctly stated:

"'The Court's powers as well as its duties and limitations are governed by statute (Act of March 4, 1913, 37 Stat. 989, ch. 150, Sec. 8, par. 64 to 69(a) incl. (Sec. 43–705 to 43–710, D.C.Code, 1951)). The statute provides that appeals to the District Court shall be heard upon the record before the Commission; that in the determination of any appeal from an Order of the Commission, the review by the Court shall be limited to questions of law; that the findings of fact by the Commission shall be conclusive unless it shall appear that such findings are unreasonable, arbitrary or capricious; and that upon the conclusion of its hearing, the Court shall either dismiss the appeal and affirm the Order of the Commission or sustain the appeal and vacate the Commission's order.'

"The court thereupon concluded that the findings of the Commission were supported by the record and were not unreasonable, arbitrary or capricious, and that the conclusions and decision of the Commission were not erroneous as a matter of law.

"At the outset of the hearing before us, appellees urged that the case is moot as a subsequent order, based on a further petition for change in rates,

---

"2. The civic organizations and a number of individual streetcar riders have not joined in this appeal.

"3. Transit's appeal was dismissed.

has been entered by the Commission and that the new order, No. 4735, supersedes Order No. 4631. We find no merit in this claim. As contended by appellants, judicial review could in this way be avoided by the initiating of proceedings regarding outstanding rates and the entering of new orders prior to the hearing of an appeal. Cf. Southern Pacific Terminal Co. v. Interstate Commerce Comm'n, 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310 (1911).

"A number of points are raised by appellant as grounds for reversal of the District Court's ruling, and as showing that:

'The Commission erred in concluding that Transit was entitled to an increase in the cash fare charged in the District of Columbia from 20¢ to 25¢ and in issuing an Order which has the end result of burdening transit riders with arbitrary and unreasonable revenue deductions, of allowing Transit excessive earnings and in permitting a cash fare 25% higher than the national median or average transit fare.'

"Appellants also charge that:

'[T]he Commission in its Order and Opinion [acted] arbitrarily, unlawfully, without and contrary to the substantial evidence of record, and without requisite finding. * *'

"We think, however, that the decision of the Commission is based on a 'suitably complete statement' of its reasons for its conclusions,[4] as will hereinafter appear.

"Section 4 of the Franchise Act, Public Law 757, 84th Cong., 2d Sess. (70 Stat. 598), provides in part that:

" 'the Congress finds that the opportunity to earn a return of at least 6½ per centum net after all taxes properly chargeable to transporta-

tion operations, including but not limited to income taxes, on either the system rate base or on gross operating revenues would not be unreasonable, and that the Commission should encourage and facilitate the shifting to such gross operating revenue base as promptly as possible and as conditions warrant; and if conditions warrant not later than August 15, 1958.'

"Appellants say in effect that, although the Commission gave lip service to the direction of Congress to encourage the shift to a gross operating revenue method, it in fact used the system rate base method and, in doing so, made many errors.

"Acting on the directions contained in Section 4 of the Act, the Commission concluded:

" 'Upon consideration of the record in this proceeding and the specific Findings [contained in the order] * * * 1. That the gross operating revenue method should be utilized to fix rates in this proceeding.' [Finding No. 1[5] and Conclusion 1 of Order No. 4631.]

"Using this method the Commission found that, for the test period (the year ending December 31, 1960), the rate schedule provided would produce net operating income of $1,143,249, or a rate of return of 4.10%, which rate of return the Commission found reasonable. The Commission, however, further determined that the system rate base applicable to mass transportation operations provided a useful means of checking the reasonableness of the result obtained from the use of the gross operating revenue method.

"Despite the Commission's actual use of the gross operating revenue method, appellants insist that the Commission in

"4. Florida v. United States, 282 U.S. 194, 51 S.Ct. 119, 75 L.Ed. 291 (1931); Beaumont, S. L. & W. Ry. v. United States, 282 U.S. 74, 51 S.Ct. 1, 75 L.Ed. 221 (1930).

"5. Finding No. 1 is as follows: '1. That the Company has complied substantially

with the intent of the Franchise Act and with the conditions heretofore indicated by the Commission as warranting the utilization of the gross operating revenue method for rate-making purposes in keeping with the legislative policy declared in Section 4 of the Act.'

fact made use of the system rate base method and that the Commission erred in its rate base determinations. This is not correct. The Commission made use of the system rate base method as one of the ways of *testing* the reasonableness of the gross operating base method. It may well be that, if the Commission erred in its rate base determinations, it may have used data which did not properly test the reasonableness of the gross operating revenue method. While that would not necessarily make invalid the Commission's determinations, it is a matter which we should pursue and, if material errors are demonstrated, the proceedings might be remanded to the Commission to test the reasonableness of the gross operating revenue base in accordance with the proper method of testing.

"However, we find no such material error. The Commission found Transit's rate base of $16,016,810 to be reasonable. This finding is attacked by appellants. This rate base determination by the Commission followed the testimony of staff witness Falk, in which he proposed that amount based upon giving equal weight to the net investment in rate base property based on original cost and based on purchase price. While it is not necessary to set forth in detail the schedule [Exhibit 39, J.A. p. 53] reaching this average, the summary thereof contained in the Commission's Findings shows the figures relied upon:

Based on Original Cost:

| | | |
|---|---|---|
| Investment in Road and Equipment at Original Cost | | $49,818,778 |
| Plus Construction Work in Progress | | 467,752 |
| | | 50,286,530 |
| Less the Reserve for Depreciation | | − 31,476,647 |
| | | 18,809,883 |
| Plus the Investment in Materials and Supplies | | 774,508 |
| Net Investment in Property applicable to Total Operations | | 19,584,391 |
| Less the Investment in Property devoted to Other than Mass Transportation Operations: | | |
| Limousine Operations | | − 87,806 |
| Charter and Sightseeing Operations | | − 355,078 |
| Net Investment in Rate Base Property based on Original Cost | | $19,141,507 |

Based on Purchase Price:

| | | |
|---|---|---|
| Investment based on Original Cost | | $19,141,507 |
| Less the balance in Account 401.3—Acquisition Adjustment (Credit): | | |
| Applicable to Total Operations | $6,332,663 | |
| Less Allocation to Charter Operations | − 83,268 | − 6,249,395 |
| Net Investment in Rate Base Property based on Purchase Price | | $12,892,112 |
| Average of Original Cost and Purchase Price | | $16,016,810 |

"The appellants' witness before the Commission recommended a rate base of $12,041,217,[6] based on the net investment in road and equipment as of September 30, 1959, adjusted to exclude the undepreciated cost of rail facilities as of December 30, 1959, in the amount of $5,121,644 [Exhibit 10–A, J.A. p. 48].

"Appellants here contend that the rate base should not exceed $9,200,000 'which is Transit's capital investment in 1956 when it purchased the transit facilities previously operated by another company (plus Transit's additions less depreciation and retirements to date).'

"Transit's witness took the position that rates should be established solely on the basis of gross operating revenues, although he stated that:

"'if an investment rate base is adopted, it should be based on the depreciated original cost of property to comply with promises made to the Company by Congress and the D.C. Commissioners at the time of granting D.C. Transit its franchise.'

"After consideration of both contentions, the Commission concluded, correctly we think:

"'We have heretofore found that conditions presently warrant changing over to the gross operating revenue base for purposes of this proceeding, and that the "rate base-rate of return" method should be employed to test the reasonableness of the return computed under the gross operating revenue method. Accordingly, we find that a rate base in the amount of $16,016,810 is a proper rate base applicable to mass transportation operations for the twelve months ending December 30, 1960, and we conclude that it affords a sound basis for testing the reasonableness of a return computed under the gross operating revenue method.'

"Chief among other points raised, and most vigorously pressed before us, is that unreasonable operating expenses were allowed by the Commission in connection with the system rate base test, these expenses consisting of (1) erroneous allowance of accruals for track removal and repairs, 2(a) unlawful depreciation of rail properties, and 2(b) unlawful depreciation of bus properties.

"(1) Allowance of Accruals for Track Removal and Repairs

"It is claimed that the Commission's order unlawfully permits Transit to accrue annually $1,044,196 over a ten-year period from August 15, 1956, to cover the cost of track removal.

"By virtue of the provisions of Section 7 of the Franchise Act, Transit is required to remove its tracks and to repair the streets upon such terms and conditions as the Commission determines. After investigation, the Commission arrived at the figure of $10,441,958 as the cost of the program of track removal, and directed that that cost be provided by annual accruals over a ten-year period, that is $1,044,196 per year. There is evidence in the record justifying these figures. Appellants claim that the Commission should have treated the item of $10,441,958 as a capital item and not as an operating expense.

"The determination of the estimated cost of track removal came as the result of the Commission's studies, and was based on the average of Transit's estimate of $11,883,910 and that of $9,000,-000 estimated by the staff of the Commission. It is true that since 1956, when Transit acquired the property of its predecessor, and up to the time of Order No. 4631, much less than the annual amount of $1,044,196 has been spent. The Commission found:

"'A question has also been raised with respect to the adequacy or inadequacy of the provision that is presently being made for track removal and repaving. Up to the present time, there has been only a limited amount of track removal and

---

"6. This figure was subsequently modified to $12,643,000.

repaving work undertaken, so that sufficient data are not now available for testing the adequacy or inadequacy of the provision. The Commission recognizes that the provision now being made is based on engineering estimates which may prove to be either excessive or deficient by actual experience. We have indicated our intention of keeping this matter under study with a view to making such adjustments as might be found appropriate in the future. Pending further experience, we find for purposes of this proceeding that the annual provision of $1,044,196 for track removal and repaving is reasonable.'

"We think the Commission's reasoning justifies its position, and we are not at liberty to substitute our judgment for that of the Commission. Of course, the Commission will be bound, as it states, to continue to study actual figures and to make such adjustments as would be fair in the light of actual experience.

### "2(a) Unlawful Depreciation of Rail Properties

"Complaint is made that the Commission unlawfully permitted Transit to accrue depreciation with respect to more than $2,500,000 in rail properties which had been abandoned 'and are no longer used or useful in the public services.' This action of the Commission was taken as a result of the Commission's staff's recommendations. The staff's witness agreed with Transit's estimate that the net undepreciated cost of rail properties as of December 31, 1959, was $5,121,644 and that Transit was entitled to recover this amount over some future period. The Commission's witness took the position, contrary to that of Transit, that to make provision for recovery of the entire amount over the 43.5 months of the conversion period would place too heavy a burden on the customers over that period. Accordingly, the witness proposed that the Commission 'now make provision only for that portion of the undepreciated cost that is associated with the

track facilities that were abandoned on January 3, 1960.' The Commission thereupon concluded:

" 'It is the opinion of the Commission that until such time as a new depreciation study is made, and until we have had sufficient experience with the actual cost of track removal and repaving work to test the adequacy or inadequacy of the present provision for track removal, the additional provision of $295,500 recommended by the staff witness is as far as the Commission should go at this time in making separate provision for extraordinary retirement loss related to track facilities. Numerous precedents can be found where commissions have provided for recovering extraordinary retirement losses resulting from obsolescence over a reasonable period in the future.'

"There being a reasonable basis for this finding, we find no error.

### "2(b) Unlawful Depreciation of Bus Properties

"Appellants also claim that the Commission erred in the treatment of the matter of depreciation for buses. It appears that the witness produced by appellants proposed that the unit method of depreciation be applied with respect to buses more than fourteen years of age, in lieu of the group method of depreciation presently in effect.

"We think that the record does in fact support the result reached by the Commission. We also think that the findings are entirely adequate and that they set forth the reasons leading to the ultimate conclusion of the Commission on the matter of depreciation of buses. On this point, the Commission ruled:

" ' * * * [The witness] has proposed that the unit method of depreciation be applied with respect to buses that are more than 14 years of age, in lieu of the group method of depreciation presently in effect. Under the group method of depreciation, which method is used extensively in utility regulation, rates are

based upon average service lives for the various classes of property. These rates are applied to the original cost of depreciable property so long as the property remains in service, the assumption being that accruals on property lasting beyond the estimated service life will offset deficiencies in accruals on property retired prior to reaching the average service life.

" 'The witness * * * also proposed a curious modification of the group method of depreciation which he claimed would accomplish the same results as the unit method, but under questioning he admitted that so far as he is aware no regulatory agency has adopted his proposed method. The method which he proposed would be applied to bus property alone and would give no consideration to the effect of premature retirements in other classes of property, particularly rail property. Under his proposal depreciation on buses would be reduced under the allowance proposed by the staff by $246,253. The Commission has been fully advised in this matter and is of the opinion that no change should be made in the prescribed group method of depreciating property, including buses, pending a complete study of the status of the existing depreciation reserve with respect to all depreciable property.'

"Finally, on the question of depreciation, amortization, and provision for track removal and street paving, the Commission held:

" 'After full consideration of the proposals by the various witnesses with respect to depreciation, amortization of acquisition adjustment, and provision for track removal and repaving, we adhere to our previously prescribed accounting treatment of these items, modified only with respect to the provision for extraordinary retirement loss on abandoned rail facilities as of January 3, 1960. Accordingly, we find that the proposed allowance for depreciation and amortization in the amount of $2,701,307, heretofore summarized, is just and proper. We reserve for future decision a determination as to what provision should be made with respect to any additional extraordinary property loss until such time as a depreciation study has been completed and the remaining rail facilities have been abandoned.'

"We believe that, in all of the items attacked by appellants, the Commission acted well within the limits of its expertise; that the reasons given for its actions were adequate; and that we should not disturb its findings in these respects.

"It goes without saying that the present situation is a most unusual one, resulting, as it does, from the cancellation of an old franchise and the granting of a new one; and much must be left to the expertise of the Commission, whose duty it is, in the first instance, to pass upon the many questions which will necessarily arise. There must be periods for trial—and error—but the Commission has promised to, and undoubtedly will, continue to study the situation and make such adjustments as time may require. As of the time of the order under consideration, we are unable to say that the Commission has been unreasonable or arbitrary in the performance of its duties.

"Other questions raised by appellants have been considered, but are not deemed of sufficient importance to justify reversal."

BURGER, Circuit Judge, with whom WILBUR K. MILLER, Circuit Judge, joins (dissenting).

While this appeal was pending in this court, the Transit Company made application to the recently reconstituted transit authority asking for a rate increase to 25¢ for tokens as well as cash fares. This development, apart from all other factors, suggests there is no need to remand the present case. Whether this development renders the instant appeal

moot in the strict legal sense, is beside the point. For practical purposes the entire matter of transit rates is now once again under review.

As I see it, the only genuine issue is the treatment of the track removal cost. The majority rests its remand on the Commission's failure to give proper weight to "the probability that economies [from cooperative plans with the District's new highway programs] would reduce the cost [removal] called for." In using the term "probability" the majority assumes *as a fact* something on which this court has not enough information to hazard even a vague guess. The majority thus reaches a firm conclusion on a subject which the Commission said was too speculative and uncertain to act on. In short, at the time of the rate order, which affected cash fares only, the experts did not know and could not estimate what economies might develop by cooperation between the Transit Company's program for track removal and the District's highway program. The needless character of the remand is further emphasized by the fact that, as has now been discovered, track removal may turn out to be either not feasible or not necessary; all this can be fully explored in the new rate case now pending.

The other points relied on by the majority seem to ignore the inherent nature of rate making. Rate making is predicated on estimates of future factors, often described as "educated guesses." That some of the hypotheses do not develop as assumed does not undermine a rate order. The regulatory authority is always in control and adjustments can be made. We were not ordained to engage in rate making or to "second guess" rate makers on factual and technical matters, and we have neither the competence nor the facilities to do so. All that is needed now to do substantial justice—which is all any rate making can ever do—is to take notice judicially that the entire matter of future rates is now before the recently reconstituted rate authority where all these problems can be re-examined. The burdens attend-

ing the challenged increase of 5¢ in cash fares poses problems, remedial and procedural in nature, which are not warranted by the amounts involved. I find it difficult to see how the cash fare rate payers who paid the increased 5¢ during the brief period of the order will regard themselves as benefited if the bulk of the "savings" is consumed by litigation expenses, as it very likely will be.

### Supplemental Opinion

PER CURIAM.

In compliance with the request set forth in the opinion of the court of January 31, 1963, the parties have submitted their views as to the judgment appropriate to carry out the opinion.

Our judgment will direct the District Court to set aside Order No. 4631 issued by the Commission March 2, 1960, insofar as it granted an increase in the cash fare to be charged its customers by D. C. Transit System, Inc., from 20 cents to 25 cents. Said order was superseded by Commission Order No. 4735 of January 18, 1961. The latter order has not been reviewed by this court, although proceedings with respect to it are now pending in the United States District Court for the District of Columbia. Since our present decision extends only to Order No. 4631, our judgment, in addition to ordering that order to be set aside, will be limited to a disposition of the problem created by its invalidation, namely, the disposition of the amount received by Transit due to the charge of the additional 5 cents in cash fare during the period between March 6, 1960 (the effective date of the increase in fare) and January 18, 1961.

It is not feasible to require refunds to be made to individuals who paid the increase. Nevertheless, the amount realized by Transit from the increase must be utilized for the benefit of the class who paid it, that is, those who use Transit. To accomplish this Transit will be required to establish a fund in an amount equal to the 5 cent increase collected during the specified period, in other words,

⁵⁄₂₅ or 20 per cent of the total cash fares collected. Since the actual amount received may have been utilized by Transit and hence is not presently available in cash, the District Court on our remand may require the establishment, to the extent the cash is not available, of a special account or reserve on the books of Transit, with appropriate offsetting adjustments in other Transit accounts if deemed desirable. The utilization and disposition of the fund, or the special account or reserve, as the case may be, shall be left to the discretion of the Commission having regulatory authority with respect to Transit, provided such discretion is exercised consistently with the purpose of benefiting Transit users in any rate proceedings pending or hereafter instituted. For example, the fund might be used to cover costs which otherwise might lead to an increase in fares, or might be used to aid in determining whether fares should be reduced now or hereafter.

Since, notwithstanding our decision holding the Commission Order invalid insofar as it increases the cash bus fare from 20 cents to 25 cents, Transit continues to charge the 25 cent cash fare under Commission Order No. 4735, this court, under its supervisory jurisdiction and, also, to determine whether further action is necessary or desirable to make the review jurisdiction of the courts effective in light of a superseding order or superseding orders of the Commission, will entertain a motion to require Commission Order No. 4735 to be stayed insofar as it authorizes the collection of a 25 cent cash fare.

It is also our view that reasonable attorneys' fees for appellants and others who have been counsel for the class benefited, reasonable expert witness fees, and appropriate litigation expenses, should be paid by Transit and charged to the fund or reserve, though taxable costs are not to be so charged. Such payments of fees and expenses accord with established equitable principles obtaining in such cases. See Sprague v. Ticonic National Bank, 307 U.S. 161, 59

S.Ct. 777, 83 L.Ed. 1184 (1939); Washington Gas Light Co. v. Baker, 90 U.S. App.D.C. 98, 195 F.2d 29 (1951).

Our judgment is without prejudice to the right of the Washington Metropolitan Transit Commission to exercise consistently with our opinions and judgment in this cause any powers it may have.

The judgment of the District Court is reversed and the proceedings are remanded to that court with directions to enter judgment in accordance with the foregoing and to take such further action as may be consistent therewith.

It is so ordered.

WILBUR K. MILLER, and DANAHER and BASTIAN, Circuit Judges, dissent.

BURGER, Circuit Judge, dissents for the reasons stated in his opinion of January 31, 1963.