**DEMOCRATIC CENTRAL COMMITTEE of the DISTRICT OF COLUMBIA, Petitioner,**

v.

**WASHINGTON METROPOLITAN AREA TRANSIT COMMISSION, Respondent,**

**D. C. Transit System, Inc., Intervenor.**

**DISTRICT OF COLUMBIA, Petitioner,**

v.

**WASHINGTON METROPOLITAN AREA TRANSIT COMMISSION, Respondent,**

**D. C. Transit System, Inc., Intervenor.**

**The BLACK UNITED FRONT, Petitioner,**

v.

**WASHINGTON METROPOLITAN AREA TRANSIT COMMISSION, Respondent.**

**Nos. 24398, 24415, 24428.**

United States Court of Appeals, District of Columbia Circuit.

July 10, 1970.

---

C. Beldon White, II, Asst. Corporation Counsel, with whom Mr. Hubert B. Pair, Acting Corporation Counsel, was on the motion, for petitioner District of Columbia.

Mrs. Jean Camper Cahn, Washington, D. C., with whom Mr. Edgar S. Cahn, Washington, D. C., was on the motion, for petitioner The Black United Front.

Mr. Landon G. Dowdey, Washington, D. C., for petitioner Democratic Central Committee of District of Columbia.

Mr. Douglas N. Schneider, Jr., General Counsel, Washington Metropolitan Area Transit Commission, Washington, D. C., for respondent.

Mr. Harvey M. Spear, New York City, for D. C. Transit System, Inc., intervenor in Nos. 24,398 and 24,415.

Before ROBINSON, MacKINNON and WILKEY, Circuit Judges.

**PER CURIAM:**

Once again we are requested to stay Order No. 1052 of the Washington Metropolitan Area Transit Commission, this time pending its judicial review on the merits. That order, issued last June 26 for effective operation on June 28, authorizes D. C. Transit System, Inc., to increase its fares for bus transportation in the District of Columbia and its Maryland suburbs. On June 27, upon motions of the present petitioners, we stayed the order until final decision by the Commission on petitioners' respective applications for reconsideration.[1] On July 1, the Commission disposed of those applications adversely to petitioners, and deferred the fare increases to 12:01 a. m. on tomorrow. Petitioners return on petitions for review accompanied, as mentioned, by motions to stay the order until after we have decided the matter on the merits.

Unlike the proceeding leading to our earlier stay, which hinged on resolution of a single legal problem, the instant motions invoke our general authority to suspend an administrative order *pendente lite*. The criteria by which the decision thereon is to be guided appear in four inquiries framed in our leading case on the subject.[2] "(1) Has the petitioner made a strong showing that it is likely to prevail on the merits of its appeal? * * * (2) Has the petitioner shown that without such relief, it will be irreparably injured? * * * (3) Would the issuance of stay substantially harm other parties interested in the proceedings? * * * (4) Where lies the public interest?"[3] The task at hand is to determine whether the circumstances before us, when tested by these standards, warrant a stay of Order No. 1052.

On yesterday, we conducted a full hearing on the motions for stay, in which counsel for all parties participat-

1. Black United Front v. WMATC, 141 U.S.App.D.C. ——, 436 F.2d 227 (Opinion filed July 2, 1970).

2. Virginia Petroleum Jobbers Ass'n v. FPC, 104 U.S.App.D.C. 106, 259 F.2d 921 (1958).

3. *Id.* at 110, 259 F.2d at 925.

ed. We have also, both before and after the hearing, studied carefully the complex materials on which Order No. 1052 was predicated, as well as the oral and written presentations by the parties. We have concluded that the motions for stay should be denied and, although because of the extreme pressure of time [4] we are unable to delineate our reasons as fully as we and the parties might desire, we endeavor herein to indicate in brief summary the principal factors and considerations that persuade us to that conclusion.

The legal arguments against Order No. 1052 are numerous and somewhat variegated. Some question the breadth of the Commission's investigation into the proposed increases. Others object to the Commission's treatment, or lack of treatment, of particular factors.[5] Still others challenge any fare increase prior to administrative and judicial adjudication of issues left unresolved by prior ratemaking litigation.[6] We do not, of course, pursue the full merits at this stage, but can do so only after ample opportunity for the parties to develop their contentions and for this court to rule on them. Rather, our present call is to weigh the case on a series of estimates, one of which, as stated, is the likelihood that petitioners will eventually win on the merits. We deem some of petitioners' contentions substantial, but their long-run potency a matter of much greater difficulty. We believe, however, that petitioners' showing as to ultimate success on the merits is not in any event so strong that it could override other countervailing considerations that bear heavily on the matter of stay.

Emerging from the voluminous data of record are circumstances that give one pause when the realities of suspending Order No. 1052 are faced. Transit has sustained net income losses exceeding $2 million during the calendar years 1967–69. By the Commission's estimates, Transit will incur a further loss of $3,974,990 if existing fares are continued during the future annual period. Transit's equity has dwindled from a high of $4,291,706 in 1964 to a low of $1,282,336 near the end of 1969. Already Transit faces a severe shortage of operating funds resulting from its inability to accommodate its day-to-day expenses from the revenues generated by those fares. It is small wonder, then, that the Commission doubted whether Transit, without fare increases, could stay in business. Petitioners do not challenge the Commission's statistics as far as they go, or the Commission's conclusion if properly rested on them, but urge that the Commission's probe should have gone much deeper. We, however, cannot ignore the prospect, to which the record lends credence, that the increases are essential to Transit's continued existence, nor can we treat lightly the serious constitutional question that denial of the increases would pose in these circumstances.[7]

We have been cited to no authority, and we know of none, which would justify ordering Transit to continue operations at a loss. To do so would be to deprive Transit of its property without due process of law, in direct violation of the constitutional prohibition. In considering the alternatives

---

4. Our hearing was set as soon as practicable in view of the need to afford the parties an opportunity for filings. As we have pointed out, Order No. 1052 is currently scheduled to take effect one minute after midnight tonight.

5. See D. C. Transit System, Inc. v. WMATC, 121 U.S.App.D.C. 375, 350 F. 2d 753 (en banc 1965).

6. See Williams v. WMATC, 134 U.S.App. D.C. 342, 415 F.2d 922 (en banc 1968),

cert. denied, 393 U.S. 1081, 89 S.Ct. 860, 21 L.Ed.2d 773 (1969); Payne v. WMATC, 134 U.S.App.D.C. 321, 415 F. 2d 901 (1968).

7. See, e. g., Smyth v. Ames, 169 U.S. 466, 18 S.Ct. 418, 42 L.Ed. 819 (1898); Railroad Commission Cases (Stone v. Farmers Loan & Trust Co., 116 U.S. 307, 6 S.Ct. 334, 388, 1191, 29 L.Ed. 636 (1886).

available before granting the fare increase, the Commission faced up to this requirement. Whatever the ultimate solution of this troubled transit problem, all the interested parties may as well start from the premise that if the company operates at all, it cannot be compelled to operate at a loss. For the interested parties here or the general public to proceed on any other premise is to engage in wishful thinking which can only lead to bitter frustration and disillusionment.

■ We are mindful, too, that a stay order can represent no more than an informed judgment as to what the future holds for the litigants. The experience of the past warns constantly that such judgments, however well conceived, may sometimes succumb to the fallibility of human perception. So it is that "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." [8] Should, upon our investigation of the merits, it eventuate that the fare increases made possible by Order No. 1052 were unwarranted, the excess fares can be recouped for the benefit of the riding public by the establishment of a riders' fund of the type we have employed in the past.[9] This, concededly, is not a wholly satisfactory device,[10] but on the other side of the coin is the disturbing fact that Transit would suffer an irredeemable loss should we grant a stay and later discover that we did so erroneously, assuming that Transit were able to stay in business. The law is well settled that Transit under such circumstances could not be permitted to charge fares in the future to cover its losses in the past, even though they result from a stay subsequently found to have been improvidently awarded.[11] Transit's losses, in this case, as projected by the Commission, amount to some $70,000 per week.

Lastly, we look to the public interest considerations involved, and these fall partly on each side of the line. Indisputably, execution of Order No. 1052 will engender foreseeable hardships. The hike in fares will be felt, in varying degrees, over a broad segment of the District's citizenry, with its most severe impact upon the poor. By one estimate, there will be a decrease of about eight million of some 112 million rides per year. On the other hand, the Commission's findings portray an absolute necessity for additional revenue if Transit is to meet its operating expenses and costs of debt service, and a very real threat that without the authorized increases Transit may be forced to discontinue or curtail its existing public service. We are unable to see how the public interest would be worse served by a higher fare than by no public transportation system at all.

We also note that the 40-cents fare rate is not higher than in other cities comparable in population and extent to Washington, D.C. Of the 46 largest United States and Canadian cities the maximum fare within the city, including transfer charges where applicable, is 40 cents or greater in 23 of these cities.[12] Many of these transit systems have subsidies in one form or another. Washington, D.C. does not, hence it does

8. Virginia Petroleum Jobbers Ass'n v. FPC, *supra* note 2, 104 U.S.App.D.C. at 110, 259 F.2d at 925.

9. See Williams v. WMATC, *supra* note 6; Bebchick v. Public Utilities Comm., 115 U.S.App.D.C. 216, 318 F.2d 187 (*en banc*), cert. denied, 373 U.S. 913, 83 S. Ct. 1304, 10 L.Ed.2d 414 (1963).

10. Notable difficulties are that the group of busriders who earlier paid higher fares . is not identical to the group reaping the future benefit, and that a riders' fund is no help to one whose economic circumstances are such that a fare increase puts bus transportation beyond his reach.

11. See Williams v. WMATC, *supra* note 6, 134 U.S.App.D.C. at 360–361, 415 F. 2d at 940–941.

12. See appendix hereto. The comparable fares for purposes of this case are set forth in column (4) because D. C. transit fares include transfer privileges.

not appear that the 40-cents fare level, considering the question in regard to the stay only, is clearly unjustified to provide essential operating revenue for the transit system.

The Commission's investigation of the proposed fare increases extended over a period of three months. During the five days of hearings it held, it heard testimony consuming more than 800 pages of the transcript, and examined a large number of exhibits. Comparatively little countervailing evidence was introduced by protesting parties. The Commission also explored alternatives to a fare increase, but the opponents of the increase offered no alternative and the Commission found none; failing in that regard, it specified safeguards against diversions of funds for special purposes to other uses.[13] Overall, Order No. 1052 signals no significant defect or deficiency on its face; and the rate of return it projects compares favorably in level with those allowed by other recent fare orders,[14] some of which actually produced no return whatever.[15]

Our present ruling does not immunize Order No. 1052 from petitioners' attacks, nor will it hinder remedial action if latent errors should later come to light. All we decide today is that, on the basis of the showing made and on balance of the relevant considerations, there is insufficient cause to upset it now. We will, however, exert our energies with a view to an early disposition of the litigation on the merits. We will streamline the briefing schedule for the parties, set a special date for oral argument and lend our best efforts to expedite the final decision. And we take this action in reliance upon the representation made by the Transit Company that it will not pay any dividends to stockholders during the current operating year.

Motions denied.

13. A prominent example, among several, was the Commission's requirement that $620,000 of Transit's net operating income be escrowed to enable down payments on purchases of new buses.

14. Transit's average rate of return for the period 1956–68 has been 3.2 percent on gross operating revenues. Under the fares authorized by Order No. 1052, Transit expectably will generate a rate of return of 5.21 percent. It must be remembered, however, that $620,000 of the projected net operating income of $2,440,284 must be devoted, under Commission supervision, to down payments on new buses, see note 13, *supra*; moreover, $1,533,138 will be required for interest payments. Transit's indebtedness considered, the Commission felt that it was "highly unlikely" that Transit could pay any dividends to its investors in the current operating year, and Transit has represented to the court that it will not undertake to do so.

15. Transit has not earned any return since 1968. Transit attributes this to overestimates in revenues and underestimates in expenses in the process of projecting the returns.

APPENDIX

CASH FARES, TRANSFERS AND MAXIMUM FARES IN 46
LARGEST U. S. AND CANADIAN CITIES
(SOURCE: A.T.A. FARE SUMMARY BOOKLET)

| | (1) CASH FARE | (2) TICKETS OR TOKENS | (3) TRANSFER | (4) MAXIMUM FARE WITHIN CITY INCL. TRANSFER | (5) OWNERSHIP | (6) REMARKS |
|---|---|---|---|---|---|---|
| CITY | | | | | | |
| Kansas City, Missouri | $.50 | None | $.05 | $.65 | Public | Zone System |
| Akron, Ohio | .40 | 5/$1.75 | .02 | .42 | Private | — |
| Chicago, Illinois | .40 | None | .05 | .45 | Public | — |
| St. Louis, Missouri | .40 | None | .05 | .45 | Public | — |
| Atlanta, Georgia | .35 | 3/$.90 | .05 | .40 | Private | Zone System |
| Cincinnati, Ohio | .35 | 5/$1.50 | .10 | .55 | Private | Zone System |
| Cleveland, Ohio | .35 | 5/$1.75 | .05 | .40 | Public | — |
| Denver, Colorado | .35 | None | .05 | .40 | Private | — |
| Houston, Texas | .35 | 10/$3.00 | Free | .55 | Private | Zone System |
| Louisville, Kentucky | .35 | 10/$3.50 | .05 | .40 | Private | — |
| Montreal, Canada | .35 | 3/$.90 | Free | .35 | Public | — |
| Pittsburgh, Pennsylvania | .35 | None | .05 | .45 | Public | — |
| Portland, Oregon | .35 | None | Free | .35 | Private | — |
| Toledo, Ohio | .35 | 5/$1.75 | .05 | .55 | Private | Zone System |
| Baltimore, Maryland | .30 | .30 | .05 | .35 | Private | — |
| Birmingham, Alabama | .30 | 20/$5.50 | .05 | .55 | Private | Zone System |
| Buffalo, New York | .30 | 10/$3.00 | .05 | .35 | Private | — |
| Columbus, Ohio | .30 | 5/$1.50 | Free | .30 | Private | — |
| Dallas, Texas | .30 | None | Free | .70 | Public | Zone System |
| Detroit, Michigan | .30 | 7/$2.00 | .05 | .35 | Public | — |
| Fort Worth, Texas | .30 | 8/$2.00 | .02 | .37 | Private | Zone System |
| Indianapolis, Indiana | .30 | None | .05 | .35 | Private | — |
| Los Angeles, California | .30 | .30 | .05 | * | Public | * Zone System |
| Memphis, Tennessee | .30 | .30 | .05 | .35 | Public | Zone System |
| Milwaukee, Wisconsin | .30 | 10/$2.75 | Free | .40 | Private | — |
| New York, New York (C) | .30 | .30 | Free | .55 | Public | — |
| Oklahoma City, Oklahoma | .30 | None | Free | .40 | Public | Zone System |
| Omaha, Nebraska | .30 | 36/$9.00 | .02 | .32 | Private | — |
| Phoenix, Arizona | .30 | None | .05 | .45 | Private | Zone System |
| Philadelphia, Pennsylvania | .30 | None | .05 # | .47 | Public | — |
| San Diego, California | .30 | 4/$1.00 | Free | .30 | Public | — |
| Toronto, Canada | .30 | 4/$1.00 | Free | .60 | Public | Zone System |
| Honolulu, Hawaii | 25 | 5/$1.00 | Free | .35 | Private | Zone System |
| Long Beach, California | .25 | 5/$1.00 | Free | .32 | Public | Zone System |
| Miami, Florida | .25 | None | Free | .25 | Public | — |
| Minneapolis–St. Paul, Minn. | .25 | None | Free | .25 | Private | — |
| Newark, New Jersey | .25 | None | .10–.20 | ** | Private | ** Zone System |
| New York, New York (A) | .25 | None | Free | .55 | Private | Zone System |
| New York, New York (B) | .25 | None | Free | .55 | Private | Zone System |
| Norfolk, Virginia | .25 | 10/$2.25 | Free | .40 | Private | Zone System |
| Oakland, California | .25 | 4/$1.00 | Free | .35 | Public | Zone System |
| Rochester, New York | .25 | 8/$2.00 | .02 | .27 | Public | — |
| San Antonio, Texas | .25 | None | .02 | .40 | Public | Zone System |
| Seattle, Washington | .25 | .25 | Free | .45 | Public | Zone System |
| Boston, Massachusetts | .20 | .20 | None | .20 @ | Public | — |
| San Francisco, California | .20 | .20 | Free | .20 | Public | — |
| Vancouver, Canada | .20 | 4/$.75 | Free | .20 | Public | — |
| New Orleans, Louisiana | .15 | .15 | Free | .30 | Private | Zone System |

NOTE: Summary includes two private-owned and one public-owned systems for New York City, New York.

* – Denotes zone system includes 107 zones within city with a possible maximum fare of $1.87 for a 57 mile trip within the city

** – Denotes zone system covers large suburban area west of New York City which includes 33 cities with populations greater than 25,000. A total of 396 cities and towns are served in 20 of the 21 counties in the state of New Jersey.

@ – If no transfer is needed.

# – Each use. On one line an additional $.02 charge is made at specified intersections.

## SUMMARY

Of the 46 largest U. S. and Canadian Cities (Not including Washington D. C.)

1. The maximum fare within the city, including transfer charges where applicable is $.40 or greater in 23 of these cities.

2. 1 of these cities have a basic cash fare of $.50
   3 of these cities have a basic cash fare of $.40
   10 of these cities have a basic cash fare of $.35
   19 of these cities have a basic cash fare of $.30
   10 of these cities have a basic cash fare of $.25

3. 1 of these cities has a $.10 transfer charge
   1 of these cities has a $.10 or $.20 transfer charge
   (depending on where transfer is used.)
   18 of these cities have a $.05 transfer charge
   5 of these cities have a $.02 transfer charge
   20 of these cities have free transfers
   1 of these cities does not use transfers

4. 22 of these cities use a zone system within the city

5. The average maximum fare within the city, including transfer charges where applicable, for all systems on which maximum fares are shown, is $.39