Morton EISEN, on behalf of himself and all other purchasers and sellers of "odd-lots" on the New York Stock Exchange, similarly situated, Plaintiff,

v.

CARLISLE & JACQUELIN and DeCoppet & Doremus, each limited partnerships under New York Partnership Law, Article 8, and New York Stock Exchange, an unincorporated association, Defendants.

No. 66 Civ. 1265.

United States District Court, S. D. New York.

April 7, 1971.

Mordecai Rosenfeld, New York City, for plaintiff.

Carter, Ledyard & Milburn, New York City, for defendant, Carlisle & Jacquelin.

Kelley, Drye, Warren, Clark, Carr & Ellis, New York City, for defendant, De-Coppet & Doremus.

Milbank, Tweed, Hadley & McCloy, New York City, for defendant, New York Stock Exchange.

## OPINION

TYLER, District Judge.

Once again the case of Eisen v. Carlisle & Jacquelin has reached the point of determining whether it meets the requirements of a class action under Rule 23 of the Federal Rules of Civil Procedure. This is the latest in a series of opinions dealing with this complex issue, and it may not be the last. To recapitulate: Eisen v. Carlisle & Jacquelin, 41 F.R.D. 147 (S.D.N.Y.1966) initially determined that this case could not be maintained as a class action; Eisen v. Carlisle & Jacquelin, 370 F.2d 119 (2d Cir. 1966), cert. denied, 386 U.S. 1035, 87 S.Ct. 1487, 18 L.Ed.2d 598 (1967) [hereinafter cited as *Eisen I*] held that the denial of the class action determination was appealable; Eisen v. Carlisle & Jacquelin, 391 F.2d 555 (2d Cir. 1968) [hereinafter cited as *Eisen II*] reversed the initial denial of the class action and remanded to the district court for further findings necessary for the class action determination; Eisen v. Carlisle & Jacquelin, 50 F.R.D. 471 (S.D.N.Y.1970) called for further information from the parties as required by the Court of Appeals opinion in *Eisen II*. The nature of the case and of plaintiff's claims are adequately described in the prior opinions.

All parties have responded ably to the Court of Appeals and latest district court opinions, and it would appear that the court now has sufficient information to make all of the required findings for the class action determination.

First, the findings of fact relevant to the class action determination will be listed.[1] These findings were developed on remand and are based on submissions by the parties. Second, the conclusions required by Rule 23 will be made in light of these findings. Finally, the question of who shall pay for the cost of the Rule 23(c)(2) notice will be discussed.

## FINDINGS OF FACT

1. During the period from May, 1962 through June, 1966, approximately 21,000,000 public individuals, institutions and intermediaries[2] (hereinafter collectively referred to as "shareholders") bought and/or sold shares of stock of the more than 6,700 corporations whose shares are publicly held.

---

1. The detailed findings of fact listed here should in no way be taken as an indication that this is a necessary procedure in every class action determination. See Interpace Corp. v. City of Philadelphia, 438 F.2d 401 (3d Cir. Feb. 9, 1971). The approach has been dictated by the peculiar background and nature of this case.

2. The term "public individuals" means individuals who are neither members of the New York Stock Exchange nor partners nor stockholders in a member organization of the Exchange.
 The term "institutions" includes savings banks, educational institutions, foundations, religious groups, non-profit organizations, life and other insurance companies, investment clubs, mutual funds and closed-end investment companies, nonfinancial corporations, partnerships, governmental bodies, personal holding companies, and non-bank-administered estates, guardianships, pension funds, personal trusts, and profit-sharing plans having legal ownership of the shares bought and sold.
 The term "intermediaries" means nonmembers of the New York Stock Exchange through whom orders for public individuals, institutions and other legal owners are placed with member firms. They include commercial banks, trust companies and non-member broker/dealers who place orders which are processed in an account or accounts in the name of the intermediary.

2. Approximately 6,000,000 shareholders had odd-lot transactions (transfers involving less than 100 shares) during the period from May, 1962 through June, 1966 in stocks listed on the New York Stock Exchange (hereinafter "NYSE"). Approximately 6,600,000 shareholders had odd-lot transactions during the period from May, 1962 through June, 1968 in stocks listed on the NYSE. The number of shareholders having odd-lot transactions grew in the period June, 1966 through June, 1968 by approximately 5 percent a year, or a total of 600,000 persons.

3. During the period May, 1962 through June, 1966, the "average shareholder"[3] who had odd-lot transactions in stocks listed on the NYSE had approximately 5 such transactions. The average odd-lot transaction during such period was approximately 28.2 shares at $50.84 per share. The average odd-lot differential per transaction during such period was approximately $5.18.

4. During the period May, 1962 through June, 1968, the average shareholder who had odd-lot transactions in stocks listed on the NYSE (taking into account an increase in odd-lot volume which was greater than the increase in shareholders having odd-lot transactions), had approximately 7.4 such transactions. The average odd-lot transaction during such period was approximately 28.6 shares at $51.07 per share. The average odd-lot differential during such period was approximately $5.04.

5. Of the approximately 6,000,000 shareholders who had odd-lot transactions from May, 1962 through June, 1966 in stocks listed on the NYSE, the names and addresses of at least one-third, i. e.

2,000,000, can be identified as follows: fourteen of the largest brokerage firms[4] (hereinafter "wire firms") transmit their customers' odd-lot orders by teletype directly to either Carlisle & Jacquelin or DeCoppet & Doremus. (The remaining firms employ the telephone or some other means of communication.) These fourteen brokerage firms account for approximately 56 percent of the odd-lot transactions on the NYSE. The two odd-lot firms possess computer tapes on which are recorded the transactions of each wire firm customer who has had an odd-lot transaction since May, 1962. By comparing the records and tapes of the odd-lot firms with the wire firm tapes which contain the name and address of each customer, names and addresses of odd-lot customers can be generated.

6. Defendants Carlisle & Jacquelin and DeCoppet & Doremus, by the use of these computer tapes, can obtain the account numbers of a limited number of the largest of the odd-lot customers of the fourteen wire firms (who may or may not be the largest odd-lot customers) during any relevant period for which such tapes are available, as well as the number of odd-lot transactions executed for each such account number.

7. Of the approximately 6,000,000 shareholders who had odd-lot transactions from May, 1962 through June, 1966 in stocks listed on the NYSE, the names and addresses of the balance, approximately two-thirds, i. e., 4,000,000, cannot be identified with reasonable effort.

8. The shareholders who had odd-lot transactions from May, 1962 through June, 1968 in stocks listed on the NYSE reside in every state in the United States

---

3. I. e., the typical buyer or seller of odd-lots.

4. These fourteen firms are: Merrill, Lynch, Pierce, Fenner & Smith, Inc.; Bache & Co. Inc.; Francis I. duPont & Co. Inc.; Loeb, Rhoades & Co.; Dean

Witter & Co. Inc.; Goodbody & Co.; Walston & Co., Inc.; Harris, Upham & Co. Inc.; Shearson, Hammill & Co. Inc.; Paine, Webber, Jackson & Curtis; Hayden, Stone, Inc; Reynolds & Co.; E. F. Hutton & Company Inc.; and Dominick & Dominick, Inc.

as well as in most non-communist countries in the world. Approximately 6 percent reside in foreign countries. The geographical distribution of purchasers and sellers of odd-lots in stocks listed on the NYSE is, in proportion, the same as the geographical distribution of all owners of shares of stocks of public corporations as expressed in the table attached as Appendix A. From 1962 to 1965, New York and California had by far the largest numbers of such shareowners.

9. In addition to the shareholders who had odd-lot transactions from May, 1962 through June, 1968 in stocks listed on the NYSE, approximately 100,000 or more public individuals had odd-lot transactions during the same period in stocks listed on the NYSE through the "Monthly Investment Plan." [5] Such individuals can be identified through computer tapes in a way similar to that discussed above for approximately 2,000,000 shareholders.

10. In addition to the shareholders who had odd-lot transactions from May, 1962 through May, 1968 in stocks listed on the NYSE and the Monthly Investment Plan customers described above, approximately 150,000 public individuals had odd-lot transactions during the same period in stocks listed on the NYSE through "payroll deduction plans", [6] all of which are operated by Merrill, Lynch, Pierce, Fenner & Smith, Inc. The names and addresses of such individuals can be identified through the records of Merrill, Lynch.

11. During the relevant period, the NYSE employed an advertising program in the United States under which it advertised in approximately 755 newspapers. The approximate cost of the space for a single one-eighth page insertion in these 755 newspapers was $65,000. The approximate cost of the space for a single one-eighth page insertion in every daily newspaper in the United States and Puerto Rico is $110,000. The NYSE also advertised in four or more magazines during each year from 1962 through 1968. The cost of space for magazine advertising during the first six months of 1968 was $400,000. The NYSE advertised in no other media.

12. There are at least 556 daily newspapers in the United States that carry full or partial quotations of stocks listed on the NYSE.

13. Member firms of the NYSE have offices located in approximately 842 cities or towns in the United States, and in 61 cities or towns in foreign countries. Additionally there are thousands of intermediaries who are located in virtually every country in the non-communist world.

14. Rule 409 of the NYSE provides in part as follows:

(a) Except with the permission of the Exchange, member organizations shall send to their customers statements of account showing security and money positions and entries at least quarterly to all accounts having an entry, money or security position during the preceding quarter * * *.

(d) Customers' confirmations shall bear a notation or legend which

---

5. The "Monthly Investment Plan" allows public individuals, through member firms of the NYSE, to accumulate a stock or stocks of their choice on a pay-as-you-go basis by payment to the member firm of any amount from $40 to $1,000, either in monthly or quarterly installments. All Monthly Investment Plan transactions are in odd-lots.

6. A "payroll deduction plan" allows public individuals who are employees of corporations to accumulate stock of the corporation by which they are employed on a pay-as-you-go basis by regular deduction by the corporate employer from the salary or wages of the employee. Employees who are enrolled in payroll deduction plans share, pro-rata, all the brokerage commissions and other expenses incurred in the purchase of shares. Normally, a payroll deduction for such purchases requires odd-lot rather than round-lot transactions.

will enable the customer to determine the amount of any odd-lot differential.

15. A representative sample from the available tapes of the fourteen wire firms (consisting of the tapes from four of the wire firms) indicates that for the period from mid-1962 through mid-1966, 1,967 account numbers had ten or more odd-lot transactions.

16. Cherner v. Transitron Electronic Corporation, 201 F.Supp. 934 (D.Mass. 1962) involved a class action brought under the Securities Act of 1933 on behalf of Transitron stockholders who purchased stock on or before February 20, 1962. The parties agreed, with the approval of the court, that defendants would create a $5,300,000 fund to settle all claims. The court appointed a Special Master, two Assistant Special Masters (including a computer corporation engaged to process claims), a distribution agent and an agent to arrange for publication of notice.

The Special Master mailed approximately 150,000 applications (forms for proof of claim) to brokers and to stockholders of record of Transitron for completion and return. Approximately 48,000 claims covering 50,000 transactions were received by the Special Master during the 60-day filing period; of this number, approximately 13,000 were invalid, 1,177 were disapproved (143 of these after hearing) and 33,039 were approved.

The approximate expenses involved in administering the settlement fund were as follows: (a) counsel fees and expenses—$275,000; (b) Special Master—$54,000; (c) Assistant Special Master (attorney)—$79,000; (d) Assistant Special Master (computer corporation)—$688,000; (e) Distribution Agent—$12,000; (f) services related to publication (not including actual publication costs)—$9,000. The total expense was approximately $1,117,000.

The cost of distributing the settlement fund among the 33,036 claimants

ultimately found entitled to participate averaged $25.47 per person excluding attorney's fees and $33.80 per person including attorney's fees.

17. The class action aspect of State of West Virginia v. Chas. Pfizer & Co., Inc., et al., 314 F.Supp. 710 (S.D.N.Y.1970) (hereinafter cited as the *"Drug Cases"*) involved a recovery on behalf of all consumers who purchased broad spectrum antibiotic products from 1954 to 1966. It is estimated that the class includes approximately 150 million persons located in every state of the Union and Puerto Rico. Defendants in the *Drug Cases* agreed to settle all cases for a total of $100,000,000; $37,000,000 of that was allocated to the class of individual consumers. Defendants also agreed to advance the expenses of maintaining and settling the class action, with the amounts so advanced to be deducted from the settlement fund if and when the settlement was ultimately approved.

18. The total expense of maintaining and settling the *Drug Cases* consumer class action will be approximately $285,000. These expenses can be divided into the following three categories:

(a) *Rule 23(c) (2) Notice*—A notice informing class members of their right to file claims or opt-out of the class was published in every English and Spanish language newspaper of general circulation published in the United States. The total cost was approximately $130,000. In response to this notice 42 individual consumers served notices opting out. During the months immediately subsequent to publication of this notice, plaintiffs' attorneys received several hundred telephone calls from individual consumers and attorneys throughout the country seeking technical legal information with regard to the notice, including the nature of the claims asserted in the complaints, the right of a consumer to opt out, the liability of a consumer for costs and expenses if he did not opt out and other related expenses.

(b) *Rule 23(e) Notice*—A notice of hearing on the proposed settlement was published in the two newspapers of largest circulation in each state. The total cost of this publication was around $30,000. In addition, the Rule 23(e) notice was sent to each individual consumer who had filed a claim. Approximate expenses for this notice were: $6,300 for the preparation of the consumer class mailing list and $7,100 for duplicating and mailing the notice. In addition, about $8,500 of general expenses (cost of post office boxes and the expense of an escrow agreement) have been allocated to the consumer class. The total expense to the consumer class was, therefore, $53,000, in round numbers.

(c) *Processing of Claims*—As of August, 1970, plaintiffs' attorneys had received $65,000 for processing consumer claims; the best estimate for the total expense for this item is $100,000. Approximately 42,000 individual claims, representing total drug purchases of approximately $17,000,000, have been filed. All claims have been processed by plaintiffs' attorneys using their own filing system, refund forms and forms for responding to claimants. No special master has yet been appointed or found necessary. Approximately one-half of the 42,000 claims received did not contain sufficient information to be accepted and required follow-up correspondence seeking clarification.

Approximately 80 percent of the claims filed contained only approximate cost information for various reasons, viz.: claimant had no records of drugs purchased; druggist refused to supply the information; drug store had ceased doing, business; doctor could not or would not supply the information. To check validity of claims, plaintiffs' attorneys are reviewing each claim where total purchases exceed $1,000 and spot checking all others. Three categories have been established after review: claims approved in full, claims approved in part and disapproved claims. Plaintiffs' attorneys are recommending to the court that all approved claims be paid a fixed percentage of their total drug purchases.

19. Costs of publication of various size notices in newspapers of several large cities are set forth in Appendix B.

20. The printing cost for 2,000,000 copies of plaintiff's proposed notice would be approximately $9,350. The printing cost for 2,000,000 verified claim forms as proposed by defendants would be approximately $9,400.

21. The cost for stuffing a single page printed notice and mailing it with first class domestic postage would be 10 cents per letter, including the postage, irrespective of the number of letters to be sent.

## RULE 23 CONCLUSIONS

### I. *Prior Determinations*

The Court of Appeals heretofore has determined that certain requirements on the face of Rule 23 are satisfied in this action. To summarize, under Rule 23 (a): (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; and (3) the claims of plaintiff are typical of the claims of the class. *Eisen II*, 391 F.2d at 561–562. Rule 23(b) (1) and (2) are not applicable to this action. *Eisen II* at 564. Under Rule 23(b) (3), the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, *Eisen II* at 566, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy. *Eisen I*, 370 F.2d at 121.

### II. *Questions to be Considered on Remand*

#### A. *Adequacy of Representation*

The first question left open by the Court of Appeals for consideration by

this court was whether the plaintiff, as representative party, will fairly and adequately protect the interests of the class. F.R.Civ.P. Rule 23(a) (4). For making this decision, the Court of Appeals set out certain guidelines. First, this court is to determine whether the attorney for plaintiff is "qualified, experienced and generally able to conduct the proposed litigation." *Eisen II*, 391 F.2d at 562. Second, the court must be satisfied that there is little likelihood of a collusive suit or of plaintiff's having interests antagonistic to those of the remainder of the class. *Id.* Third, and generally, the court must be satisfied that plaintiff is interested enough to be a forceful advocate and that a substantial number of class members would accept him as their representative *if they were given a choice. Id.* at 563 n. 7; Weinstein, Revision of Procedure: Some Problems in Class Actions, 9 Buff.L.Rev. 433, 460 (1960).

■ I have no hesitation in ruling that plaintiff and his attorney meet all of these requirements. It has already been determined that plaintiff's claim is typical of the claims of the class, and from the nature and quality of the litigation conducted to date, there is little doubt that plaintiff's attorney is a qualified, forceful advocate who will adequately protect the interests of the entire class. The issues raised thus far have all been hotly disputed, to say the least, and I find no evidence before me that this is a collusive suit. Defendants have suggested that since plaintiff has proposed a "fluid class recovery" as a means of distributing some if not all of the damages to the class, somehow this indicates that he has interests which are antagonistic to the remainder of the class. But, for reasons which are discussed more fully below in connection with the issue of manageability, I reject this argument and find that plaintiff's proposal is a flexible and practical means of satisfying the interests of the entire class.

### B. *Manageability*

■ The second and by far the most difficult question to be considered by this court is what has generally been called the issue of manageability. It derives from one of the factors to be considered under Rule 23(b) (3) in determining whether a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Pursuant to subparagraph (D), the court must examine "the difficulties likely to be encountered in the management of a class action." Although this is merely one factor among many on the face of the Rule, in a case of the size and nature of this one, the issue of manageability assumes major proportions.

Before discussing specific details of the management of this class action, a definitive ruling should be made as to the exact composition of the class. Based on the allegations in the complaint and on the findings set forth above, the class in this case is composed of all public individuals, institutions and intermediaries who bought and/or sold odd-lots of shares of stock on the NYSE during the period from May 1, 1962 through June 30, 1966. Such definition is, of course, subject to modification at a later time. Rule 23(d), F.R.Civ.P.

■ 1. *Computation of Damages.* One of the primary concerns of this court in its most recent opinion was whether, if liability were established, a specific amount of damages in fact could be determined without having each member of the class file an individual claim. In approaching this question, it is recognized that an exact computation is not required; it is sufficient, of course, if there is relevant data from which the jury can make a just and reasonable estimate of the damage. Bigelow v. RKO Radio Pictures, 327 U.S. 251, 264, 66 S.Ct. 574, 90 L.Ed. 652 (1946); see also Union Carbide and Carbon Corporation v. Nisley, 300 F.2d 561, 590 (10th

Cir. 1962), appeal dismissed, Wade v. Union Carbide & Carbon Corp., 371 U.S. 801, 83 S.Ct. 13, 9 L.Ed.2d 46 (1962). If a wrong has been done, courts generally can find a way of placing a value, albeit a rough one, on the amount of damages suffered.

■ In this case, I am satisfied that gross damages may be fairly estimated without having individual claims filed by each class member. The sources for such a computation will include at least the following: defendants' own records, the Report of Special Study of Securities Markets of the Securities and Exchange Commission, H.R.Doc.No.95, Part 2, 88th Cong., 1st Sess. (1963) [hereinafter cited as SEC Special Study], records of the NYSE Special Committee on Odd Lots relating to the lowering of the odd-lot differential in 1966 and a cost study of the odd-lot industry conducted for the NYSE by Price Waterhouse & Co. See Daar v. Yellow Cab Company, 67 Cal.2d 695, 63 Cal.Rptr. 724, 433 P.2d 732 (1967); *contra,* Hawaii v. Standard Oil Company of California, Civ. No. 2826 (D. Hawaii, filed May 27, 1969).

Defendants consistently have stressed the number of variations in the types of odd-lot transactions, implying that this would necessitate a separate calculation of damage for each individual transaction. Although originally influenced by this argument, see Eisen v. Carlisle & Jacquelin, 41 F.R.D. 147, 150 (S.D.N.Y. 1966), in light of the availability of such information and records discussed above, I now reject it. As the Court of Appeals has pointed out, moreover, defendants make the same charge to all buyers and sellers no matter what the type of transaction. *Eisen II,* 391 F.2d at 562.

2. *Mechanics of Administration.* Under this heading the Court of Appeals directed that certain specific questions be considered to insure that insuperable obstacles do not present themselves at a later time after much time and money are expended by both the parties and the court. In the discussion of these questions, it will be noted that most of the estimates involved are based primarily on the experience of this court in administering the settlement of the consumer class action phase of the *Drug Cases.* Defendants have argued, and at least two courts have indicated, that the experience in the *Drug Cases* is not a valid reference for cases where there is no settlement and all issues are disputed to the bitter end. See Hackett v. General Host Corporation, Civ. No. 70–364 (E.D.Pa., filed July 30, 1970); Record of May 19, 1970, at 41–42, Union Health Center of New York v. Chas. Pfizer & Co. Inc., Civ. No. 69–2838 (S.D.N.Y.). There is something to be said for this position; thus, where obvious distinctions between this case and the *Drug Cases* have required, I have adjusted estimated expenses accordingly. On the other hand, it is obvious that the major burden and cost of administering this class action will occur, if at all, at the point where liability has been determined and damages awarded. If this case should ever reach that posture, the remaining task would be distribution of a specific fund and in this sense not very different from the settlement posture and procedures of the *Drug Cases.*

As to the specific areas of determination suggested by the Court of Appeals, first, I find that a special master hopefully and probably will not be necessary in this case. Although a special master and two assistants were appointed in the *Cherner* case at substantial cost, see Finding Number 16, I note that this procedure was successfully avoided in the *Drug Cases* where the burdens have been assumed by plaintiffs' counsel. Although it is true that plaintiff's counsel here is a single practitioner, he may receive assistance from counsel for other class members, and if not, arrangements for administrative assistance should not be too difficult or costly—and less costly, it is to be assumed, than the fees and expenses of a master.

Second, an estimate of the sums required for paperwork, printing, postage

and publication is required. These sums can be divided into three categories: (a) Rule 23(c) (2) Notice, (b) Rule 23 (d) Notice if liability and damages are determined and (c) processing of claims and inquiries.

(a) As discussed more fully below, the cost of notice required by due process and Rule 23(c) (2) in this case can be computed at approximately $21,720.

(b) If liability and damage should be determined, more extensive notice to invite filing of claims under Rule 23(d) might be possible since the expense of such notice could be deducted from the total amount of damages. Thus, estimates for mailing individual notices to the 2,000,000 identifiable class members here, see Finding Number 5, would be $9,350 for printing notices, $9,400 for printing proof of claim forms and $200,000 for stuffing and mailing. In addition, relying on the *Drug Cases*, published notice might be required in the two newspapers of largest circulation in each state at a cost of approximately $30,000. Publication in several major foreign newspapers can be estimated at $23,000. See Finding Number 19 and Appendix B.

(c) Processing of the 42,000 individual claims filed in the *Drug Cases* is expected to reach a total cost of approximately $100,000. See Finding Number 18. However, since this figure may not reflect the cost of processing of inquiries after the Rule 23(c) (2) notice and because there is great likelihood that there may be a larger number of claims filed in the instant case, an estimate for processing of claims and inquiries should be double the *Drug Cases* figure, or approximately $200,000.

Thus, combining all three categories, at this point in the litigation the best estimate of the total sums required for paperwork, printing, postage and publication is $500,000 in round numbers.

The third mechanical question generally concerns procedures for possible intervention of other class members. See *Eisen II*, 391 F.2d at 567. As the class action device has come to be used more frequently, the experience in this court has indicated that intervention can be accomplished by very simple procedures. For example, class members so inclined might contact plaintiff's counsel and make an appropriate motion setting forth concise facts indicating that the would-be intervenors qualify as class members.[7]

The fourth mechanical question concerns possible problems class members might have in filing and proving their claims. Filing, of course, can be routinely accomplished by filling out and mailing in a proof of claim form to be supplied by the court through plaintiff's counsel. Defendants have already proposed a form which appears acceptable, with some possible minor modifications. Claims can be proved either by verification or certification by the claimant's broker-dealer. An analogous method has proved satisfactory in the *Drug Cases*. See also Union Carbide and Carbon Corporation v. Nisley, *supra*, 300 F.2d at 587–588. Defendants have submitted affidavits of brokers stating that, because of routine destruction of records or practical impossibility, they would be unable to furnish

---

7. Also, the appellate court suggested, *Eisen II* at 567, that consideration be given to possible problems of jurisdiction and venue. Upon remand, counsel have not suggested nor do there appear to exist significant jurisdictional problems, save perhaps those related to the substance of plaintiff's claims discussed hereinafter.

Since defendants are located within this district, as is the bulk of relevant documentary evidence, venue seems proper here. Finally, no significance in relation to the class action determination issue attaches to the fact that plaintiff has already demanded a jury trial.

customers with records of their odd-lot transactions in the relevant period. Accepting these affidavits as true, they do not establish that all such records are unavailable through broker-dealers; moreover, it cannot be assumed from these available affidavits that customers are without records of their own. Lost or missing records are normal hazards of litigation in general; this circumstance cannot be fairly raised as a bar to class litigation.

3. *Distribution of Recovery.* The Court of Appeals has made clear that one of the most important considerations in a case of this type is the likelihood that class members will share in any eventual judgment. In weighing the class action question, the trial court must balance the desirability of providing a forum for bona fide small claims against the impropriety of permitting suits which only benefit lawyers. *Eisen II*, 391 F.2d at 567. Crucial also is the ability of the court to fashion a remedy, relying on its own and counsel's ingenuity, where a wrong has been done and where the consequences of not fashioning a remedy would permit avoidance of appropriate sanctions and the retention of illegal profits. See In re Multidistrict Private Civil Treble Damage Antitrust Litigation Involving Motor Vehicle Air Pollution Control Equipment, 52 F.R.D. 398 (C.D.Cal.1970); Daar v. Yellow Cab Company, *supra.* Cf. Bigelow v. RKO Radio Pictures, *supra,* 327 U.S. at 264–265, 66 S.Ct. 574.

Distribution of an eventual recovery to the class members in a case such as this one need not be viewed solely in terms of personal and individual damages and recoupment thereof. Such a view is appropriate where the disputed transactions themselves are personal and individual and have litigable significance to the plaintiff. The situation here, however, is different. Although the total volume of transactions is very large, each transaction, as far as the issues here are concerned, is thoroughly stereotyped and is sufficiently small so that the benefits of individual recovery are not worth the price of litigating individual claims. These transactions are also frequently repeated by many individuals who may be expected to repeat. See Finding Number 2.

With these indicia present, I think it appropriate, as plaintiff urges, to consider some kind of "fluid class recovery", i. e. to consider distribution of damages to the class as a whole rather than to adopt, at this initial, planning stage, an inflexible mold of recovery running to specific class members. To emphasize individual recovery is to unduly stress considerations not totally relevant to the conditions of this case, especially the small amounts of potential recoveries by most class members, which, absent the class device, would effectively bar suit by the majority of odd-lot investors. Perhaps fortuitously, the repetitive activity of the principals in odd-lot transactions makes it possible to fashion a procedure which will assure that the benefits of any recovery will flow in the main to those who bore the burden of defendants' allegedly illegal acts. Indeed, there is respectable precedent for such a "fluid class recovery". See Bebchick v. Public Utilities Commission, 115 U.S.App.D.C. 216, 318 F.2d 187 (1963), cert. denied, 373 U.S. 913, 83 S.Ct. 1304, 10 L.Ed.2d 414 (1963); the *Drug Cases, supra;* Daar v. Yellow Cab Company, *supra.* This does not mean, of course, that individual recovery is to be entirely ruled out. Individual claims may be satisfied to the extent they are filed, but the fluid class recovery might then be appropriate for distribution of the unclaimed remainder.

It is not now necessary to determine the exact nature of fluid class recovery which might be used in this case. That is a matter for the court and the parties if and when liability is determined and damages assessed. It is necessary to recognize at this point, however, that a method of recovery of dam-

ages not claimed by individual class members can be fashioned to substantially benefit the entire class. In this regard, plaintiff has suggested that a fund equivalent to the amount of unclaimed damages might be established and the odd-lot differential reduced in an amount determined reasonable by the court until such time as the fund is depleted. See Bebchick v. Public Utilities Commission, *supra*; Daar v. Yellow Cab Company, *supra*. In this manner, the class members, assuming they have maintained their odd-lot activity, will reap the benefits of any recovery. Without intending to rule now on the nature of any possible recovery in this case, suffice it to say that plaintiff's suggestion has sufficient merit to at least satisfy the court that some method of distribution will be possible if required.

Defendants have argued that plaintiff, by advancing this proposal, has effectively abandoned the original class and thereby establishd his inadequacies as champion of that class. I am constrained to disagree, however, since the proposal is specifically designed to provide the best practicable method of benefiting the original class—i. e. to insure that the litigation, if successful for the class, does not founder upon shoals of excessive costs and detail in awarding and computing damages on an individual basis. In addition, defendants have suggested that plaintiff's proposal would constitute "judicial rate-fixing", thereby infringing upon the exclusive jurisdiction of the Securities and Exchange Commission ("SEC"). This argument may have merit, but defendants press it too far— i. e. such a reduction in the differential, if carried out, might properly be done under SEC supervision or at least with SEC approval.

Having thus considered possible methods for distribution of a recovery, there remains only for consideration the "mathematical prospects" of the case in order to ascertain at least the theoretical availability of a fund from which to distribute damages. This simply means and requires a rough estimation of potential damages, deducting therefrom the estimated costs of administration to determine a net potential fund available for actual distribution. The costs of administration were estimated heretofore at $500,000. Estimating gross potential damages is necessarily more difficult, but a rough maximum and minimum might be arrived at as follows: (1) maximum—defendants' reduction of the odd-lot differential in 1966 amounted to approximately $5,000,000 per year—multiplied by the four years here in question and trebled, damages might be $60,000,000; (2) minimum—assuming a five percent illegal portion of the odd-lot differential during the relevant period [8] and applying it to the average number of transactions and the average differential during the relevant period, multiplied by 6,000,000 and trebled, damages might be approximately $22,000,000. Thus, it becomes apparent that if plaintiff succeeds on behalf of the class, there will be a substantial recovery to be distributed.

### C. *Notice*

■ Determination of the kind of notice and how to disseminate it, as this case illustrates, can be a difficult task for the district court. Notice must be governed not only by basic due process standards but also by the standards of Rule 23(c)(2) itself. Thus, an examination of these requirements will be necessary before determining the kind of notice appropriate in this case.

■ As stated in Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950),

---

8. Plaintiff has estimated that he paid $259 in odd-lot differentials from 1960–1966 and that his damages were about $70. Thus, his claim is that approximately 27 percent of the charge was illegal. For purposes of establishing a minimum on potential damages, I have arbitrarily chosen 5 percent.

the fundamental requirement of due process in any final proceeding is "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id.* at 314, 70 S.Ct. at 657. The test is a flexible one and must be applied on a case-by-case basis: "[I]f with due regard for the practicalities and peculiarities of the case these conditions are reasonably met the constitutional requirements are satisfied." *Id.* at 314–315, 70 S.Ct. at 657. Frequently a balancing of interests is required. *Id.* at 313–314, 70 S.Ct. 652. In addition, emphasis is to be placed upon the procedure adopted as a whole to insure that it results in full and fair consideration of all claims and adequately protects the interests of those persons not present but bound by the judgment. Hansberry v. Lee, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940). See also Mullane v. Central Hanover Bank & Trust Co., *supra*, 339 U.S. at 319, 70 S.Ct. 652; Dolgow v. Anderson, 43 F.R.D. 472, 500 (E.D.N.Y. 1968); Northern Natural Gas Co. v. Grounds, 292 F.Supp. 619, 636 (D.Kan. 1968); State of Iowa v. Union Asphalt & Roadoils, Inc., 281 F.Supp. 391 (S.D. Iowa 1968), aff'd., Standard Oil Co. v. Iowa, 408 F.2d 1171 (8th Cir. 1969).

 Rule 23(c) (2) does not add to these requirements; it simply formulates guidelines for a particular kind of notice in a particular kind of action. See *Eisen II*, 391 F.2d at 568; Advisory Committee's Note, Proposed Rules of Civil Procedure, 39 F.R.D. 98, 107 (1965) [hereinafter cited as Advisory Committee's Note]. The district court must direct to the members of the class "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." F.R.Civ.P. Rule 23(c) (2). As is clear from the face of the Rule, the notice should be designed to inform class members of the possibility of their excluding themselves

from the action, the possibility of their appearing and participating in the action and the fact that they will be bound by any judgment if they do not exclude themselves. In light of these purposes, it naturally follows that as the size of potential recovery available to each class member diminishes, any incentive class members may have to respond to the notice also diminishes. See Berland v. Mack, 48 F.R.D. 121, 129 (S.D.N.Y.1969). Consequently, where a class consists of a large number of claimants with relatively small individual claims, notice to individual class members, as a legal and practical matter, becomes less important and need not be unduly emphasized or required.

Although not so stated in the Rule, the notice effectively serves to protect defendants in two ways. First, by including in the judgment all members who do not affirmatively opt out, defendants can obtain significant *res judicata* benefits. Second, a large number of class members may opt out, not wishing to press their claims even though they may be legitimate. In the context of this case, it is significant that the applicable statute of limitations has run, 15 U.S.C. § 15b (1964); hence *res judicata* consequences presumably matter little to defendants. But see Philadelphia Electric Company v. Anaconda American Brass Company, 43 F.R.D. 452, 461 (E.D.Pa.1968).

 Finally, in determining what kind of notice is required by due process and Rule 23(c) (2), it must be recalled that expensive and stringent notice requirements could vitiate the class action device in situations where application thereof as a matter of public policy can be important, such as private antitrust, consumer and environmental litigation. See Herbst v. Able, 47 F.R.D. 11, 21 (S.D.N.Y.1969); Dolgow v. Anderson, *supra*, 43 F.R.D. at 497. Cf. Booth v. General Dynamics Corporation, 264 F.Supp. 465 (D.Ill.1967). Hence, the district court must strive to fashion notice which fairly and adequately protects all interests in the action without im-

posing what in effect amounts to an insuperable tariff on prosecution of the case.

1. *Form of Notice.* Applying these general principles to the case at hand, the Court of Appeals has indicated that there should be some "evidentiary basis for the findings necessary to support rulings of what would or would not amount to compliance with the requirements of due process and with the provisions of 23(c) (2)." *Eisen II*, 391 F.2d at 569. I believe that the findings of fact enumerated above should satisfy this requirement, and they are to be deemed incorporated in this discussion.

 First, plaintiff has offered to send individual notice to all member firms of the NYSE and to all commercial banks with large trust departments, the assumption being that many class members may thus receive indirect but nevertheless effective notice. Although, by itself, this would be far from satisfactory, in combination with the other forms of notice discussed below, this proposal does increase the likelihood of reaching a significant portion of the class. The same is true for any news coverage which might be generated during the course of this suit. See Snyder v. Board of Trustees of University of Illinois, 286 F.Supp. 927 (N.D.Ill.1968); Johnson v. Robinson, 296 F.Supp. 1165 (N.D.Ill.1967), aff'd, 394 U.S. 847, 89 S.Ct. 1622, 23 L.Ed.2d 30 (1969).

 Second, some form of mailed notice must be sent to individual class members who are reasonably identifiable. Defendants have taken the position that any mailed notice must go to all of the approximately 2,000,000 class members who are identifiable. See Finding Number 5. Although the argument has some merit, I conclude that such notice is not compelled by the standards of due process and Rule 23(c) (2) in the context of this case. First, the flexibility of the rule is clear on its face, speaking in terms of the "best notice practicable under the circumstances" and of class members who are identifiable "through reasonable effort."[9] In addition, even due process requirements have been phrased in terms of identifying persons whose names and addresses are "very easily ascertainable". Schroeder v. City of New York, 371 U.S. 208, 212–213, 83 S.Ct. 279, 9 L.Ed.2d 255 (1962).

Individual notice in this case shall be mailed to the approximately 2,000 or more class members who had ten or more transactions during the relevant period. See Finding Number 15.[10] This accords with the Court of Appeals' suggestion of trying to identify those class members who may have "enough of a stake in the proceedings to justify personal intervention." *Eisen II*, 391 F.2d at 569. In order to insure adequate representation and to gain more information about the nature of the class, individual notice shall also be mailed to 5,000 other class members selected at random from the 2,000,000 persons and firms who are identifiable.[11] The total

---

9. See also Kaplan, Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rules of Civil Procedure (I), 81 Harv.L.Rev. 356, 396 (1967):
In particular cases it may be practicable to give notice under (c) (2) which will reach each member of the class. That will not be possible in all cases, but when large numbers of people are dealt with, perfect notice, while on the one hand hard to attain, becomes on the other hand unnecessary because of the probability that some individuals who are representative of differing opinions within the group (if such differences exist) will in fact be reached and will speak up.

10. The figure in Finding Number 15 is based on a representative sample of the tapes of four of the fourteen wire firms which have such tapes. I assume that a survey of the remaining tapes will turn up more than the approximately 2,000 identified so far.

11. There is an additional reason for requiring this random notice—it is theoretically possible that the large claimants might form a special subclass either friendly toward defendants or not entirely representative of the small claimants.

cost would be approximately $1,000 for printing, stuffing and mailing.

██ Third, and finally, notice by publication shall be required as a feasible attempt to reach the remainder of the class. Such notice shall be one-quarter page in size and shall take place once each month for two consecutive months in the following publications: (1) national edition of the *Wall Street Journal* (approximately $5,000); (2) financial section of the *New York Times* (approximately $2,100); (3) financial sections of the *San Francisco Chronicle* and *San Francisco Examiner* (approximately $1,-700); and (4) financial section of the *Los Angeles Times* (approximately $1,-560). Obviously, these are somewhat arbitrary determinations intended to provide the most suitable notice under the circumstances, but there are significant reasons for choosing these publications. The *Wall Street Journal* has long served the overall community of investors, and the national edition should reach a large and disparate number of class members. Also, as of 1965, New York and California had by far the largest number of shareowners of public corporations in comparison to all other states; there is no reason to suppose their position has slipped in the intervening six years. See Finding Number 8 and Appendix A. Selection of the particular cities and newspapers is designed to reach the largest number of class members in those areas.

In the circumstances of this case, I reason that such notice devices together will fairly accommodate the interests of both the class and the defendants. Assuming that a significant number of class members should exclude themselves, this might be viewed as an indication that the interests of the class are not being adequately represented. In such event, to properly consider the question of whether defendants should be shielded from the expense and effort of defending a suit which a large number of class members may not favor, further individual notice might then be required. On the other hand, a lack of response to the notice would not shed any light on adequacy of representation and would probably mean that the notice was sufficient for this case. See *Eisen II* at 563.

██ 2. *Contents of Notice.* Although it is not necessary to decide now the final content of the notice, plaintiff has made a proposal, attached as Appendix C, which is succinct and, with minor modifications, should be satisfactory. That proposal specifically includes a brief description of the proposed fluid class recovery, thus giving each class member an opportunity to express himself on this aspect of the suit. In order to gain more information about the nature of the class, the mailed notice to individual class members will also include a request for the following information: the number of odd-lot transactions during the 1962–1966 period, specifying for each the number and price of shares bought or sold, the name of the stock, the name of the brokerage firm and the amount of the odd-lot differential charge if known. Such a request will be for voluntary responses only and will not be treated as a requirement for inclusion as a member of the class. But see State of Iowa v. Union Asphalt & Roadoils, Inc., *supra*, 281 F.Supp. at 403–404; Philadelphia Electric Company v. Anaconda American Brass Company, *supra*, 43 F. R.D. at 462. Not only would such a mandatory procedure be contrary to the language of Rule 23(c) (2), but also it would be unnecessary in this case in light of the contemplated method of computing damages and the proposed fluid class recovery heretofore discussed.

3. *Administration of Notice.* Plaintiff shall be responsible for making all arrangements for printing, mailing and publication, except that defendants shall supply him with all necessary names and addresses of individual class members. The individual notice will be sent on court stationery from the Clerk of the Court with a special post office box des-

ignated for all responses. Inquiries and responses will be managed by the plaintiff under court supervision.

### III. *Cost of Notice*

The question of who shall pay for the Rule 23(c) (2) notice is the only serious obstacle remaining which might prevent the maintenance of this suit as a class action.[12] Plaintiff has asserted from the outset that he cannot pay for the forms and methods of notice ruled necessary in this case, and if I were to follow literally the earlier indication of the Court of Appeals that the plaintiff must always pay for the expense of notice in the first instance, Eisen II, 391 F.2d at 568, this litigation would come to an abrupt termination.

Thus, the doubts and difficulties of this class action become finally focused on this one issue. If the expense of notice is placed upon plaintiff, it would be the end of a possibly meritorious suit, frustrating both the policy behind private antitrust actions and the admonition that the new Rule 23 is to be given a liberal rather than a restrictive interpretation, Eisen II at 563. On the other hand, if costs were arbitrarily placed upon defendants at this point, the result might be the imposition of an unfair burden founded upon a groundless claim. In addition to the probability of encouraging frivolous class actions, such a step might also result in defendants' passing on to their customers, including many of the class members in this case, the expenses of defending these actions.

### A. *Considerations in Allocating Expenses of Notice*

After reviewing all of the submissions and arguments of the parties to date, I conclude that I cannot now fairly decide the question of who shall bear the expense of the Rule 23(c) (2) notice. There are various considerations which lead to the conclusion that, in the context of this case, it may be appropriate to impose a share or a substantial portion of the notice expense on the defendants.

First, the issue of who shall bear these expenses has not been decided as one rule to be applied to all cases. Although some courts and commentators have assumed that plaintiff shall always pay the cost in the first instance,[13] some have also declined to make such an assumption and recognized the propriety of apportioning the burdens in certain cases.[14] Indeed, despite the apparently unequivocal language in Eisen II, *supra,* the Court of Appeals for this circuit has indicated in a subsequent opinion that the question is still an open one. Green v. Wolf Corp., 406 F.2d 291, 301 n. 15 (2d Cir. 1968). I think that the better view is that the decision on this question, whenever required because of plaintiff's inability to pay, is an appropriate area for the exercise of the court's discretion,

12. The cost of any subsequent notice, for example under Rule 23(d) regarding the filing of claims, should not present the same problem since the issue of liability will have already been determined.

13. See Weiss v. Tenney Corp., 47 F.R.D. 283, 294 (S.D.N.Y.1969); Richland v. Cheatham, 272 F.Supp. 148, 156 (S.D. N.Y.1967); Ward and Elliot, The Contents and Mechanics of Rule 23 Notice, 10 B.C.Ind. & Com.L.Rev. 557, 556–67 (1969): Kaplan, Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rules of Civil Procedure, supra at 398 n. 157; Frankel, Amended Rule 23 from a Judge's Point of View in Symposium, "Amended Federal Rule 23: Antitrust Class Actions?"

32 A.B.A. Antitrust L.J. 251, 300 (1966). Compare Wright, Remarks to Judicial Conference of the Third Judicial Circuit, 42 F.R.D. 437, 565 (1966) *with* Wright, Class Actions, 47 F.R.D. 169, 180 (1969).

14. See Bragalini v. Biblowitz, CCH FED. SEC. LAW REP. ¶ 92,537 (S.D.N.Y. Dec. 16, 1969); Herbst v. Able, *supra*; State of Minnesota v. United States Steel Corporation, 44 F.R.D. 559, 577 (D.Minn. 1968); Dolgow v. Anderson, *supra*, 43 F.R.D. at 498–500; Note, Class Actions under Federal Rule 23(b) (3)—The Notice Requirement, 29 Md.L.Rev. 139, 156 (1969); Note, Developments in the Law —Multiparty Litigation in the Federal Courts, 71 Harv.L.Rev. 874, 938 (1958).

"having in mind the objective of enabling the class action device to be used effectively to prosecute a meritorious claim (instead of being foreclosed as too expensive) and at the same time restrained from being converted into a vehicle for harassment by frivolous claimants." Berland v. Mack, *supra*, 48 F.R.D. at 131. To the extent that this may result in the imposition of a burden on defendants prior to trial, analogy to the preliminary injunction remedy lends some support. A prime policy consideration underlying preliminary injunctive relief may be applicable here, viz., the need to create or preserve a state of affairs which will enable the court to render a meaningful decision. See Note, Developments in the Law—Injunctions, 78 Harv.L.Rev. 994, 1056 (1965).

Second, this court cannot overlook the serious nature of the antitrust claims in this suit when viewed against the strong public policy behind the antitrust laws in general, and the fundamental role of the private treble-damage action in enforcing those laws in particular. See Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 131, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); United States v. Borden Company, 347 U.S. 514, 518, 74 S.Ct. 703, 98 L.Ed. 903 (1954); Monarch Life Insurance Company v. Loyal Protective Life Insurance Company, 326 F.2d 841, 845 (2d Cir. 1963), cert. denied 376 U.S. 952, 84 S.Ct. 968, 11 L.Ed.2d 971 (1964). In a case such as this, even if the Securities and Exchange Commission were to bring its own action, it would be limited to seeking an injunction only, practically less than an adequate remedy since many of the alleged practices of defendants have been subsequently modified. The private class action is the only means of providing for repayment of any alleged illegal profits. See Dolgow v. Anderson, *supra*, 43 F.R.D. at 482–483.

Third, because the statute of limitations has now run in regard to the claims in this case, no one else will be able to pursue the offenses alleged here, not even the government. See Green v. Wolf Corp., *supra*, 406 F.2d at 301 n. 14. But see Philadelphia Electric Company v. Anaconda American Brass Company, *supra*, 43 F.R.D. at 461. In sum, plaintiff's action provides the only available means of reaching the merits of this controversy.

Fourth, after reviewing the purposes and structure of Rule 23, the Court of Appeals has specifically held that it is to be given a liberal rather than a restrictive interpretation. *Eisen II*, 391 F.2d at 563.

Fifth, the public interest in this case is at least theoretically great, not only because of the serious nature of the antitrust claims, but also because of the large number of persons affected by the allegedly illegal overcharge. The New York Stock Exchange and its member brokers owe very important duties to investors, see generally 15 U.S.C. § 78a et seq. (1964), and this suit directly raises questions concerning public confidence in the stock market and its fiduciary institutions. Cf. Silver v. New York Stock Exchange, 373 U.S. 341, 349–350, 359, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963).

Sixth, a class action will provide important *res judicata* effects for defendants, although it is true that this consideration is of little importance here because the statute of limitations has run.

Seventh, and finally, although the court has by no means reached the substance of this case as yet, there are bases for presuming merit in plaintiff's claims. In view of the SEC SPECIAL STUDY, *supra*, and the NYSE cost study and subsequent reduction of the odd-lot differential by approximately $5,000,000 per year, this cannot presently be characterized as a frivolous suit. From this it follows that it would be unfair to tax plaintiff with the cost of paying for notice at this point.

## B. *Preliminary Hearing on Merits*

 Before considering how to apportion the costs of notice, if plaintiff

cannot pay, the court itself must have a preliminary but reasonably thorough view of the merits of the case. See Berland v. Mack, *supra*, 48 F.R.D. at 132. Cf. City of New York v. International Pipe and Ceramics Corporation, 410 F.2d 295, 297 (2d Cir., 1969); Green v. Wolf Corp., *supra*, 406 F.2d at 294. Again, an analogy to the preliminary injunction is helpful: before imposing a burden on defendants prior to trial, plaintiff must make a strong showing of likelihood of success at trial on the merits. See Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 740 (2d Cir. 1953). Such a procedure is allowed even though the court cannot be assured of plaintiff's final success, particularly where the ultimate issues are to be decided by a jury. *Id.* But see Berland v. Mack, *supra*, 48 F.R.D. at 132.

In this case, the most efficient way for the court to become sufficiently aware of the merits of plaintiff's claims to make a reasoned decision on the cost of notice is to hold a preliminary hearing on the merits similar to that originally suggested in Dolgow v. Anderson, *supra*, 43 F.R.D. at 501. Although such a hearing has been considered and rejected by several courts, the facts and circumstances of those cases were markedly different from those at hand, thereby rendering those decisions distinguishable.[15]

Holding a preliminary hearing at this stage will allow the parties to conduct significant discovery, limited by the date set for the hearing. See Dolgow v. Anderson, *supra* at 502. There may be some duplication of discovery if notice should eventually go out and other counsel for plaintiffs intervene, but the court undoubtedly will be able to control any such problems.

The preliminary hearing will also serve to place the risk of success equally upon the class and defendants without requiring a crucial determination prematurely. Although it is true that counsel for other class members who later choose to intervene will not be able to participate in this preliminary hearing, this is a necessary concomitant of the procedures required by Rule 23. Moreover, the court has already determined that plaintiff's counsel adequately represents the class.

I have also determined that a preliminary hearing is superior to other possible procedures. One such alternative would be to allow the action to proceed to a determination on the merits before assessing the costs of notice and send notice only if plaintiff is successful. Compare Union Carbide and Carbon Corporation v. Nisley, *supra* with Oppenheimer v. F. J. Young & Co., 144 F.2d 387 (2d Cir. 1944). This suggestion must be rejected for several reasons: (1) it is at least theoretically contrary to the language of Rule 23 calling for an early determination of the class action question; (2) in effect it amounts to "one-way intervention", a procedure the rule was designed to avoid, Advisory Committee's Note, *supra*, 39 F.R.D. at 105–106; (3) counsel for other class members may desire to participate at an early stage. Another alternative might be to simply allow the action to proceed with discovery and pre-trial motions, postponing a decision on the cost of notice until some unspecified later date. See City of Philadelphia v. Emhart Corp., *supra*, 50 F.R.D. at 235–236. This, however, may well lead to a point at which the court and the parties become "hopelessly entangled in a mass of procedural detail and expense". *Eisen II*, 391 F.2d at 570.

Finally, after the hearing and after all papers have been submitted, a motion for summary judgment by either side may be appropriate, cf. F.R.Civ.P. Rule 12(b)

15. See City of Philadelphia v. Emhart Corp., 50 F.R.D. 232, 234 (E.D.Pa. 1970); Fogel v. Wolfgang, 47 F.R.D. 213, 215 n. 4 (S.D.N.Y.1969); Berland v. Mack, *supra*, 48 F.R.D. at 132; Mersay v. First Republic Corporation of America, 43 F.R.D. 465, 469 (S.D.N.Y. 1968). But see Green v. Wolf Corp., *supra*, 406 F.2d at 301 n. 15; Cannon v. Texas Gulf Sulphur Co., 47 F.R.D. 60 (S.D.N.Y.1969).

(6), but I am quick to point out my reluctance to treat the proceedings as a forerunner to such a motion and my inclination is to limit any determination solely to the question of who shall bear the expense of the Rule 23(c) (2) notice. See Dolgow v. Anderson, 438 F.2d 825, (2d Cir., filed Sept. 2, 1970). Summary judgment is such a drastic remedy that only in the most compelling circumstances should it be considered without opportunity for participation by other class members.

### C. *Nature of Preliminary Hearing*

The preliminary hearing will be commenced no later than 60 days from the date of the filing of this opinion. This should allow sufficient time for minimum necessary discovery and at the same time prevent the proceedings from continuing longer than absolutely necessary. The hearing itself should be brief, and the parties are encouraged to submit whatever evidence they deem relevant in the form of stipulations, affidavits or depositions to the extent that they are practicable. Actual testimony should be required only from very important witnesses.

As to the merits of the controversy, the parties are directed to address the following issues: (1) did the brokerage defendants monopolize the odd-lot market on the NYSE from 1962 to 1966; (2) did the brokerage defendants control the competition and the odd-lot differential charge in such market; (3) if such conduct by the brokerage defendants can be shown, did the NYSE breach its duties to investors under the Securities Exchange Act of 1934 by failing to exercise proper control; (4) what were the effects of the alleged anticompetitive conduct; (5) to what extent did the Securities and Exchange Commission exercise actual supervision and review over the conduct of defendants in the odd-lot field during the relevant period; (6) to what extent did the regulatory scheme set up under the Securities Exchange Act of 1934 perform an antitrust function; (7) was the conduct of defendants necessary to make the Securities Exchange Act of 1934 work? See, generally, Silver v. New York Stock Exchange, *supra*; United States v. E. I. duPont de Nemours Co., 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956); Thill Securities Corporation v. New York Stock Exchange, 433 F.2d 264 (7th Cir. 1970); 15 U.S.C. § 78a et seq. (1964). Amicus briefs will be invited from the SEC and the Antitrust Division of the Justice Department. See Thill Securities Corporation v. New York Stock Exchange, *supra* at 273.

After the hearing the following alternative courses of action are open to the court, all subject to reallocation after trial: (1) plaintiff might be required to pay the entire cost of notice; (2) plaintiff and defendants might share the cost in a proportion to be decided; (3) defendants might be required to pay for a major portion of the cost with plaintiff paying a substantial amount and posting a bond for the balance allocated to defendants, cf. F.R.Civ.P. Rule 65(c); Note, Interlocutory Injunctions and the Injunction Bond, 73 Harv.L.Rev. 333 (1959).

In summary, for the reasons discussed above I have determined that this suit is a proper class action under F.R.Civ.P. Rule 23 and, except for assessment of the cost of notice yet to be decided, it shall go forward as such. The parties are directed to expedite discovery and preparation for the preliminary hearing as outlined in this opinion.

Finally, it should be recalled that the Court of Appeals in *Eisen II* (391 F.2d at 570) expressly retained jurisdiction of the class action determination issue. Admitting to some uncertainty on the point, I believe that in the interests of orderly procedure and a complete record, any appeal should await the outcome of the preliminary hearing directed in this opinion.

It is so ordered.

## APPENDIX A

### GEOGRAPHIC DISTRIBUTION OF SHAREOWNERS OF PUBLIC CORPORATIONS

| State | Number of Shareowners (thousands) | | | |
|---|---|---|---|---|
| | 1956 | 1959 | 1962 | 1965 |
| Alabama | 30 | 87 | 114 | 172 |
| Alaska | — | 3 | 5 | 9 |
| Arizona | 33 | 62 | 95 | 179 |
| Arkansas | 17 | 50 | 58 | 94 |
| California | 1,011 | 1,480 | 2,037 | 2,540 |
| Colorado | 75 | 112 | 157 | 240 |
| Connecticut | 219 | 300 | 459 | 505 |
| Delaware | 37 | 50 | 75 | 79 |
| Dist. of Columbia | 57 | 112 | 126 | 121 |
| Florida | 172 | 312 | 522 | 704 |
| Georgia | 65 | 137 | 170 | 243 |
| Hawaii | — | 13 | 18 | 39 |
| Idaho | 10 | 26 | 33 | 43 |
| Illinois | 732 | 874 | 1,157 | 1,308 |
| Indiana | 117 | 237 | 374 | 382 |
| Iowa | 78 | 125 | 187 | 202 |
| Kansas | 54 | 112 | 157 | 221 |
| Kentucky | 53 | 100 | 124 | 161 |
| Louisiana | 64 | 100 | 151 | 149 |
| Maine | 56 | 75 | 94 | 123 |
| Maryland | 144 | 237 | 367 | 424 |
| Massachusetts | 531 | 512 | 681 | 805 |
| Michigan | 370 | 625 | 794 | 946 |
| Minnesota | 110 | 175 | 255 | 260 |
| Mississippi | 15 | 38 | 61 | 92 |
| Missouri | 178 | 325 | 408 | 501 |
| Montana | 29 | 37 | 59 | 61 |
| Nebraska | 36 | 50 | 90 | 99 |
| Nevada | 11 | 13 | 23 | 42 |
| New Hampshire | 59 | 50 | 75 | 101 |
| New Jersey | 554 | 625 | 902 | 1,086 |
| New Mexico | 10 | 37 | 46 | 60 |
| New York | 1,699 | 1,903 | 2,341 | 2,407 |
| North Carolina | 50 | 125 | 238 | 322 |
| North Dakota | 11 | 12 | 36 | 30 |
| Ohio | 317 | 587 | 791 | 865 |
| Oklahoma | 51 | 100 | 134 | 181 |
| Oregon | 54 | 100 | 152 | 200 |
| Pennsylvania | 671 | 1,024 | 1,378 | 1,408 |
| Rhode Island | 84 | 75 | 99 | 122 |
| South Carolina | 19 | 63 | 71 | 117 |
| South Dakota | 18 | 25 | 38 | 40 |
| Tennessee | 57 | 100 | 134 | 201 |
| Texas | 160 | 375 | 517 | 744 |
| Utah | 23 | 37 | 50 | 78 |
| Vermont | 29 | 37 | 55 | 72 |
| Virginia | 120 | 250 | 302 | 422 |
| Washington | 77 | 149 | 202 | 262 |
| West Virginia | 58 | 100 | 102 | 100 |
| Wisconsin | 167 | 212 | 323 | 360 |
| Wyoming | 12 | 26 | 30 | 41 |
| U. S. Terr. & Poss. | 8 | 3 | 5 | 14 |
| Foreign Countries—U. S. Citizens Living Abroad | 18 | 96 | 138 | 143 |

## APPENDIX B

| | FULL PAGE | ½ PAGE | ¼ PAGE | CIRC. |
|---|---|---|---|---|
| **Wall St. Journal** | | | | |
| National | $19,855.68 | $9,927.84 | $4,963.92 | 1,262,000 |
| Eastern | 7,672.32 | 3,836.14 | 1,918.08 | 520,000 |
| Midwest Edition | 6,287.04 | 3,143.52 | 1,571.76 | 390,000 |
| Pacific Coast | 3,907.20 | 1,953.60 | 976.80 | 231,000 |
| Southwest | 2,344.32 | 1,172.16 | 586.08 | 120,000 |
| **New York** | | | | |
| News–Full Run (Daily) | 5,530.00 | 2,765.00 | 1,382.50 | 2,130,000 |
| News–City & Sub. | 4,940.00 | 2,470.00 | 1,235.00 | 1,805,000 |
| Post | 3,492.00 | 1,746.00 | 873.00 | 698,845 |
| Times | 8,400.00 | 4,200.00 | 2,100.00 | 977,297 |
| **Chicago** | | | | |
| News | 3,918.40 | 1,959.20 | 1,066.40 | 453,000 |
| News (Sun. Times–City & Sub.) | 2,899.00 | 1,574.80 | 787.40 | 402,000 |
| News (Sun. Times–Full Run) | 3,188.90 | 1,732.28 | 866.14 | 453,000 |
| Sun-Times | 1,875.00 | 1,026.00 | 427.50 | 530,000 |
| Sun-Times (News–City-Sub.) | 1,650.00 | 906.00 | 453.00 | 506,000 |
| Sun-Times–News–Full Run | 1,815.00 | 1,122.00 | 561.00 | 530,000 |
| Today–Full Run | 1,537.00 | 864.00 | 432.00 | 435,000 |
| Today–(City-Sub.) | 1,175.00 | 720.00 | 360.00 | 422,000 |
| Today (Tribune) Full Run (C. & S.) | 1,175.00 | 720.00 | 360.00 | 422,000 |
| Tribune–Full Run | 5,498.00 | 2,876.80 | 1,531.00 | 768,000 |
| Tribune (City & Sub.) | 4,615.00 | 2,467.60 | 1,351.60 | 623,000 |
| Tribune (Today) Full Run | 4,876.00 | 2,592.00 | 1,296.00 | 768,000 |
| Tribune (Today) (City & Sub.) | 4,154.00 | 2,219.00 | 1,215.00 | 623,000 |
| **Los Angeles** | | | | |
| Herald Examiner | 4,009.60 | 2,004.80 | 1,052.80 | 503,000 |
| Times | 5,424.00 | 3,120.00 | 1,560.00 | 982,000 |
| **San Francisco** | | | | |
| Chronicle | 5,658.80 | 2,829.40 | 1,414.70 | 480,000 |
| Examiner | 3,347.12 | 1,673.56 | 836.78 | 204,000 |
| Chronicle/Examiner | 6,742.40 | 3,371.20 | 1,685.60 | 684,000 |
| **London** | | | | |
| Daily Express (D.M.) | 12,600.00 | 6,300.00 | 3,150.00 | 3,947,500 |
| Daily Mail (D.M.) | 7,800.00 | 3,900.00 | 1,950.00 | 1,992,500 |
| Daily Mirror (D.M.) | 9,674.00 | 4,837.00 | 2,419.00 | 4,924,000 |
| Daily Sketch (D.M.) | 1,910.00 | 955.00 | 475.00 | 900,000 |
| Daily Tele. & Sun.Tel. (D.M.) | 9,300.00 | 4,650.00 | 1,325.00 | 1,400,000 |
| Evening News (D.E.) | 7,865.00 | 3,933.00 | 1,966.00 | 1,088,500 |
| Evening Standard (D.E.) | 2,886.00 | 1,440.00 | 720.00 | 595,000 |
| Financial Times (Wkly. Bus.) | 5,069.00 | 2,535.00 | 1,267.00 | 172,347 |
| Greyhound Express (D.M.) | 436.00 | 218.00 | 109.00 | 68,000 |
| The Guardian (D.M.) | 3,600.00 | 1,800.00 | 900.00 | 293,000 |
| Inv. Chr. & Stock Ex. Gaz. (W.B.) | 600.00 | 300.00 | 125.00 | 50,000 |
| Morning Star (D.M.) | 720.00 | 360.00 | 180.00 | 62,000 |
| News of the World (Wkly) | 20,259.00 | 10,129.00 | 5,065.00 | 6,228,000 |
| Observer (Weekly) | 8,025.00 | 4,013.00 | 2,006.00 | 879,000 |
| The People (Weekly) | 17,280.00 | 8,640.00 | 4,320.00 | 5,455,500 |
| Sunday Express (Weekly) | 16,200.00 | 8,100.00 | 4,050.00 | 4,206,500 |
| The Sunday Times (Weekly) | 12,672.00 | 6,336.00 | 3,168.00 | 1,500,000 |
| The Times (D.M.) | 5,750.00 | 2,875.00 | 1,438.00 | 437,500 |
| Sun (D.M.) | 1,815.00 | 908.00 | 454.00 | 951,000 |
| Sunday Mirror (Wkly) | 9,758.00 | 4,879.00 | 2,440.00 | 5,009,000 |

| | FULL PAGE | ½ PAGE | ¼ PAGE | CIRC. |
|---|---|---|---|---|
| **Paris** | | | | |
| L'Aurore (D.M.) | 3,825.00 | 1,913.00 | 956.00 | 329,000 |
| L'Equipe (D.M.) | 2,253.00 | 1,127.00 | 563.00 | 365,000 |
| Le Figaro (D.M.) | 4,052.00 | 2,021.00 | 1,013.00 | 424,500 |
| France–Dimanche (Wkly) | 7,659.00 | 3,830.00 | 1,915.00 | 1,270,500 |
| France–Soir (D.E.) | 9,400.00 | 4,700.00 | 2,350.00 | 1,049,000 |
| Le Herisson-La Presse (Wkly) | 2,273.00 | 1,137.00 | 568.00 | 400,000 |
| Ici Paris (Wkly) | 6,052.00 | 3,026.00 | 1,513.00 | 981,000 |
| Le Journal du Dimanche (W.B.) | 4,550.00 | 2,275.00 | 1,137.00 | 550,000 |
| Minute (Weekly) | 1,470.00 | 735.00 | 368.00 | 151,500 |
| Le Monde (D.E.) | 3,310.00 | 1,655.00 | 828.00 | 355,000 |
| Paris-Jour (D.M.) | 1,430.00 | 715.00 | 358.00 | 257,500 |
| Paris-Presse-l'Intransigeant (D.M.) | 2,478.00 | 1,239.00 | 620.00 | 50,000 |
| Le Parisien Libere (D.M.) | 8,583.00 | 4,292.00 | 2,146.00 | 778,000 |
| La Vie Francaise (W.B.) | 3,550.00 | 1,775.00 | 838.00 | 102,500 |
| **Rome** | | | | |
| Avanti | 2,048.00 | 1,024.00 | 512.00 | 130,000 |
| Corrieredello Sport (D.M.) | 2,306.00 | 1,153.00 | 577.00 | 191,500 |
| Daily American (D.M.) | 1,891.00 | 946.00 | 473.00 | 36,000 |
| Giornale d'Italia (D.E.) | 2,884.00 | 1,442.00 | 721.00 | 90,000 |
| Il Globo (D.E.) | 2,388.00 | 1,194.00 | 597.00 | 35,000 |
| Il Messaggero (D.M.) | 4,450.00 | 2,225.00 | 1,113.00 | 301,000 |
| Momento Sera (D.E.) | 2,336.00 | 1,168.00 | 584.00 | 80,000 |
| L'Osservatore Romano (D.M.) | 2,453.00 | 1,227.00 | 614.00 | 70,000 |
| Paese Sera (D). | 3,116.00 | 1,558.00 | 779.00 | 180,500 |
| Il Popolo (D.M.) | 2,160.00 | 1,080.00 | 540.00 | 106,000 |
| Il Tempo (D.M.) | 3,895.00 | 1,947.00 | 974.00 | 220,000 |
| Il Fiorino (D.M.B.) | 2,670.00 | 1,335.00 | 667.00 | 49,000 |

D.M. = Daily Morning
D.E. = Daily Evening
D. = Daily
W.B. = Weekly Business
C. & S. = City & Suburban

## APPENDIX C

MORTON EISEN, Plaintiff v. CARLISLE & JACQUELIN, DeCOPPET & DOREMUS and NEW YORK STOCK EXCHANGE, Defendants—66 Civ. 1265

Plaintiff has brought an action in the United States District Court for the Southern District of New York on his own behalf and on behalf of all other persons who had an odd-lot transaction on the New York Stock Exchange in the period 1962–1966 (the "class"). The defendants are Carlisle & Jacquelin, DeCoppet & Doremus (referred to collectively for convenience as the "brokerage firm defendants") and the New York Stock Exchange. The essence of the action is the allegations that the brokerage firm defendants have monopolized the odd-lot business of the New York Stock Exchange and have conspired to fix an excessive odd-lot differential (the odd-lot differential being the extra amount charged when a transaction on the stock exchange involves fewer than 100 shares) in violation of the antitrust laws of the United States. It is further alleged that the New York Stock Exchange knew of these wrongs but permitted them to occur. Defendants have denied all the material allegations of the complaint and have denied any wrongdoing whatsoever. The issues of whether any of the defendants are liable and the extent of such liability are complicated and have not yet been determined by the Court.

Since it would be impracticable to return to each member of the class his pre-

cise damages the Court has ruled that any recovery, to the extent not asserted by members of the class, will be offset against the odd-lot differential charged in the future.

If you are a member of the class you may be excluded from the class if you so request in writing by [a given date]. A judgment in this case, whether favorable or not, will include all class members who do not request exclusion. Any member who does not request exclusion may, if he desires, enter an appearance through his counsel. You should be advised, however, that if you do choose to be excluded from the class you may be prevented from bringing your own action because of the running of the statute of limitations.

If you choose to be excluded from the class or if you desire to be represented by your own counsel, please notify the Court by writing to: The Clerk of the Court, United States District Court, Southern District of New York, Box # —————, ————— Post Office, New York, New York.